THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LANE ODUM, Defendant-Appellant.

(No. 53774;

First District—January 7, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Harold A. Cowen, Theodore A. Gottfried and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Lawrence Brodsky, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Three indictments were returned against defendant: the first charged him with the murder of Lee Robinson, the second charged him with the aggravated battery and attempted murder of Thomas Troope, and the third charged him with the aggravated battery and attempted murder of Hudie Redmond. Pleas of not guilty were entered to all charges and the indictments were consolidated for trial. Defendant waived a jury with respect to the charges relating to Troope and Redmond and trial was had on all charges simultaneously with the jury being excused while evidence irrelevant to the murder charge was presented. The jury found defendant guilty of voluntary manslaughter and the court sentenced him to a term of six to fifteen years. The court found defendant not guilty of the other charges. On appeal defendant contends:

(1) that he was not proven guilty beyond a reasonable doubt,

(2) that the misconduct of the prosecutor denied him of a fair trial,

(3) that the court erred in instructing the jury, and

(4) that the court erred in pronouncing sentence.

The evidence presented by the State is summarized as follows.

Katherine Huntion testified that she was Robinson's sister. She saw him at her house on October 23, 1966. At that time he was alive and in good health. She next saw Robinson at the County Morgue on October 27, 1966.

Thomas Troope testified that on October 27, 1966, he was a production supervisor in charge of about 35 people on the fourth and fifth floors of the Curtiss Candy Company. The fourth floor of the plant had two rooms, the circlet department and the mint room, separated by a wood and glass partition. The mint room had two doors, one on the north and the other on the south. Defendant was a machine operator in the mint room and Robinson was a mechanic who, in the discharge of his duties, generally carried some small tools. Troope first saw defendant that day at 5:40 A.M. and Robinson at 6:00 A.M. At 9:00 A.M. Robinson, in the discharge of his duties, went into the mint room to check a machine. Approximately five minutes later defendant came to Troope and told him that Robinson had refused to fix the machine. Robinson

soon appeared and denied the accusation, but added that defendant was loading the machine improperly. Robinson made no threats and there was no altercation. At 1:00 P.M. while in the circlet department helping Gussie Winston repair her machine, Troope noticed Robinson cleaning the machine in the mint room. About four minutes later defendant was near the machine in the mint room motioning for Troope to come into the room. Defendant then went into the circlet department, fired a gun and Hudie Redmond fell to the floor about six feet from Troope. After Thomas Chappell disarmed defendant, Troope went into the mint room and there, saw Robinson lying on the floor bleeding from his head. Troope saw nothing in Robinson's hand or on the floor near him. Robinson was not referred to as a bully.

Eugene Tapia, a physician and surgeon specializing in pathology, after being duly qualified, testified that on October 28, 1966, while employed as a coroner's pathologist, he conducted an internal and external examination of Robinson's body. A bullet wound of entry was found on the right anterior portion of the neck just below the ear. The bullet traveled downward and towards the back of the body, piercing the jugular vein, the arch of the aorta, the left lung and exiting the body at the most anterior section of the chest approximately eight centimeters from the left armpit. The bullet was fired from more than two feet away and this wound was the cause of death. Another bullet wound of entry was found at the extreme right anterior side of the chest. This bullet traveled horizontally across the chest lodging itself in the left nipple.

Hudie Redmond testified that on October 27, 1966, he worked at the Curtiss Candy Company as a janitor. While in the fourth floor circlet department he saw defendant walk down an aisle from the south, approach Troope, and, while holding a piece of iron, extend his hand in front of his body.

Gussie Winston testified that on October 27, 1966, she worked for the Curtiss Candy Company as a machine operator in the fourth floor circlet department. At approximately 1:00 P.M., while Troope was helping her fix a machine, she heard a shot, turned, saw defendant fifteen feet from her, heard another shot, and ran away.

Catherine Willis testified that on October 27, 1966, she worked at the Curtiss Candy Company in the fourth floor circlet department. At approximately 1:00 P.M. she heard a shot and saw defendant holding a gun.

Thomas Chappell testified that on October 27, 1966, he worked for the Curtiss Candy Company as a cook in the circlet kitchen on the fifth floor. Shortly after 1:00 P.M. that day he came into the circlet room and there, saw defendant carrying a blue steel .38 revolver and standing face

to face with Troope. At Chappell's request defendant gave him the weapon but then tried to get it back and a scuffle ensued. In the mint room Robinson, whom Chappel had seen earlier that day carrying his tool box, was lying on the floor. Chappel saw no knife but wrenches were on the floor near the body. Defendant was a good worker and minded his own business but Robinson, a bully, gave defendant a hard time. Chappell, although he was not on the fourth floor when Robinson was killed, told an investigator that based upon what he had heard about Robinson, defendant had acted in self-defense.

Joseph Ippolito, a Chicago police officer, testified that at 1:15 P.M. he responded to the Curtiss Candy Company and went up the rear elevator to the fourth floor where, upon disembarking from the elevator, he was met by two empolyees who were holding defendant who he arrested. Ippolito then went into the mint room and made a physical examination of the premises. That examination revealed a body lying face down in front of a machine. Although he saw a wrench in the area the only weapon discovered was a blue, steel .38 caliber revolver given to him by a plant supervisor.

Garvin Nix, a Chicago police officer, testified that he arrived at the Curtiss Candy Company at 1:45 P.M. on October 27, 1966. His examination of the mint room revealed the presence of tools by the mint machine but no weapons.

The evidence presented by the defense is summarized as follows:

James Payne testified that he knew defendant well. Defendant was a "good fellow" and had a good reputation for peacefulness and non-violence.

Bessie Phillips testified that she is defendant's daughter and that on October 27, 1966, she was living with her family. On October 26, 1966, she found a small gray or silver gun in a shoe box at her home. She gave the weapon to her mother.

James Hart testified that on October 27, 1966, he was employed as a mechanic at the Curtiss Candy Company. At approximately 12:15 on that day he worked on the mint machine. He knew Robinson who was not a pleasant fellow to work with. Earlier that morning, at 8:00 A.M., he had heard Robinson threaten defendant who had an "all right" reputation in the factory for peacefulness. The only tools necessary to fix the machine in the mint room were a screwdriver and a pliers.

Ed Shurna, an assistant chaplain at the Cook County Jail, testified that while at the jail he talked to defendant about religion.

Marvin Polk testified that he was employed by the Curtiss Candy Company on October 27, 1966, and he was also the union steward at the plant. He knew both defendant and Robinson who was a "hothead."

Samuel Jackson testified that he worked at the Curtiss Candy Company on October 27, 1966. As a result of a conversation he had with a co-worker he went to the fourth floor mint room, the door of which was open. He saw Robinson's body lying face down on the mint room floor with a four or five inch knife lying two or three feet from the head. A wrench and screwdriver were in a nearby tool box. He left only to return a second time when the police were at the scene, but he did not tell them of the knife.

Eugene Tapia was recalled and testified that Robinson was six feet tall and weighed 180 pounds.

Joseph Price testified that on October 27, 1966, he was a coroner's toxicologist. An analysis of Robinson's blood revealed 130 milligrams percent alcohol which, in the witness' opinion, would indicate that a person of Robinson's approximate age, height and weight would have consumed more than five ounces of 100 proof alcohol or ethanol within an hour. This would be equivalent to five shots or five twelve ounce bottles of beer.

Lane Odum, the defendant, testified that he was five feet four inches tall 40 years old, married 22 years and that he had no criminal record. Prior to October 27, 1966, he was employed by Curtiss Candy Company for approximately six years. He knew Robinson, who was hard to get along with, but did not know him to carry a weapon. During the previous May or June, Robinson began criticizing defendant about malfunctions in the machine which defendant worked on. Whenever Robinson would fix defendant's machine Robinson would threaten defendant. Defendant told Troope, Chappell and Polk of these threats. At 7:30 A.M. or 8:00 A.M. on October 27, 1966, defendant asked Robinson to fix the machine. Robinson said, "Whenever I get time, I'll come over there and fix it." In a few minutes Robinson came into the room and said, "Punk you done broke the machine again." Hart then came into the room and in his presence Robinson told defendant, "Punk, if you say anything else to me, I am going to kill you." Later, out of Robinson's presence defendant told Troope, with whom he had a friendly relationship, what had happened. At 12:30 P.M. or 1:00 P.M. Robinson staggered into the mint room through the north door, blew his breath into defendant's face and said, "Punk, I ought to throw you out that window." Defendant responded, "Robinson, why don't you leave me alone? Please leave me alone and go out of here. I am trying to do my work." After Robinson left, defendant knocked on the window which separated the mint room from the circlet room and motioned for Troope to come into the mint room. As defendant began working again Robinson returned to the mint room through the south door. He displayed a knife and said, "Punk, I ought

to cut your throat." The defendant said in response, "Robinson, why don't you please leave me alone and get out of here?" Robinson then hit defendant on the hand with a wrench leaving a scar. Defendant ran for the north door followed by Robinson who screamed, "Punk, I'm going to kill you." As he reached the door and tried to escape defendant found that the door would not open. Defendant then attempted to reach the south door but was again hit by Robinson. As Robinson came at defendant brandishing the knife and wrench, defendant, fearing for his life, drew his gun and told Robinson to get back. Robinson, standing only five feet from defendant, swung at defendant thereby bringing his right hand and arm in front of him. Defendant then shot Robinson but he did not remember how many times. The wrench then fell to the side of Robinson's body. Defendant received the gun as security for a $25 loan to a person with whom he had worked at the post office. Defendant took the gun home and put it in his daughter's shoe box. She found it and gave it to his wife who told defendant to get it out of the house. He took it to work, kept it in his belt all morning and at noontime took it to the river which ran alongside of the plant. He was going to throw it into the river but because there were too many people standing nearby, he did not.

Additionally, numerous witnesses for both the State and defense testified that Robinson was a much taller and heavier man than was defendant.

*Opinion*

(1) Defendant contends that he was not proven guilty of voluntary manslaughter beyond a reasonable doubt. The essence of his contention is that the evidence presented gave rise to only two possible findings by the jury; either defendant was guilty of murder or the homicide was justifiable by reason of self-defense. Thus, defendant contends, the evidence could not substantiate a conviction of voluntary manslaughter.[1]

■■■ The evidence presented at trial clearly establishes that Robinson, a man of greater height and weight than defendant, was a hothead or bully. He had repeatedly threatened the smaller, more peaceful defendant. In fact one of those threats came but a few hours prior to Robinson's death. Also the evidence established that Robinson had

---

[1] The voluntary manslaughter instruction given to the jury, based upon and substantially in the terms of Ill. Rev. Stat. 1967, ch. 38, par. 9—2(b), was as follows:

> The Court instructs the jury that, in the language of the statute, a person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in these instructions but his belief is unreasonable.

alcohol in his blood at the time of his death. Those facts taken together with the uncertain existence of the knife and the equivocal location or existence of the wrench must have led the jury to conclude that when Robinson came into the mint room that afternoon he only threatened defendant. This threat, coupled with Robinson's nature, the existing relationship between the two, and the fact that Robinson had been drinking, caused defendant to unreasonably believe that the use of his weapon was necessary to prevent his own demise. It is established, however, that threats do not constitute sufficient justification for the taking of another's life. (*People v. Golson* (1945), 392 Ill. 252, 255—256, *cert. denied,* 328 U.S. 865 (1946).) Thus, because there was sufficient evidence to support the lower grade of homicide a conviction therefor on an indictment for murder was proper. (*People v. Adams* (1969), 113 Ill.App.2d 205, 216.) Because that determination by the jury was not so unsatisfactory so as to justify a reasonable doubt of defendant's guilt the conviction will not be reversed. *People v. Hairston* (1970), 46 Ill.2d 348, 366, *cert. denied,* 402 U.S. 972 (1971).

(2) Defendant next contends that prosecutorial misconduct denied him a fair trial. This contention arises out of incidents which occurred during final arguments.

■■ First, defendant maintains that the prosecution's remarks about the defense attorneys caused the jury to believe that defendant changed his testimony pursuant to his counsel's suggestion. These comments, however, when viewed in light of the entire record and argument, were not of such magnitude as to justify reversal. (*People v. Palmer* (1970), 47 Ill.2d 289, 300, *cert. denied,* 402 U.S. 931 (1971) and *People v. Burnett* (1963), 27 Ill.2d 510, 518.) Similarly, alleged innuendo testimony by the prosecutor during final argument was not sufficient in magnitude to require reversal even when viewed with the comments considered above.

■■ Secondly, defendant contends that the prosecutor misstated the evidence when he said "there was no evidence to show that Lee Robinson was drunk." Review however cannot be had on this alleged impropriety in closing argument because timely objection was not made with regard thereto and review is not necessary in this instance to prevent deterioration of the judicial process or deprivation of a constitutional right. *People v. Winstead* (1967), 90 Ill.App.2d 167, 183.

■■ Defendant's contention that the prosecutor attempted to shift the burden of proof to defendant with respect to the effect of the alcohol on Robinson loses force when considered in light of the prosecutor's admonishment to the jury during rebuttal and the instructions to the jury. Both clearly established that the burden of proof of all essential elements

of the crime rested upon the shoulders of the State. See *People v. Pecora* (1969), 107 Ill.App.2d 283, 300, *cert.* denied, 397 U.S. 1028 (1970).

(3) Defendant also alleges various errors in the court's instructing of the jury. At the outset of this discussion it is important to note that the trial of this case took place prior to the effective date of Supreme Court Rule 451(a) which requires the use of *Illinois Pattern Jury Instructions—Criminal.*

■■■ First he contends that the giving of an instruction and form of verdict on voluntary manslaughter was reversible error. The discussion above, however, clearly establishes that there was a sufficient evidentiary basis for the verdict. Thus, the court did not err in giving the complained of instruction and the alternate form of verdict. (*People v. Pecora* (1969), 107 Ill.App.2d 283, 295, *cert.* denied, 397 U.S. 1028 (1970).). The defense also complains of that instruction (see footnote 1, *supra*) in that the words "under the principles stated in these instructions" rendered it vague. While this instruction is not as clear as it could have been, when it is read with the others we find that the jury was provided with adequate information upon which intelligent deliberation could have been carried out. (*People v. Knox* (1969), 116 Ill.App.2d 427, 435.) Additionally, we do not find that the order in which the instructions were given was confusing nor do we find that the instructions unduly limited the jury's consideration of the circumstances surrounding the killing for purposes of determining whether defendant justifiably acted in self-defense. Lastly, with respect to instructions, defendant contends that the court erred in refusing to give an instruction on the presumption of drunkenness. That instruction was based upon Ill. Rev. Stat. 1967, ch. 95½, par. 144 (c) 3. We are unable to see how the refusal of the court to give this instruction contributed to defendant's conviction. The jury heard the toxicologist's testimony establishing the alcohol content of Robinson's blood. Additionally, the jury was told approximately how much Robinson had to drink to have that amount of alcohol in his blood. The failure of the court to instruct the jury as requested by the defense was therefore clearly not prejudicial to the defendant's case.

■■ (4) Defendant's contention concerning the sentence imposed upon him by the trial court relates to both the timing of the court's pronouncement and the excessiveness of the sentence. Defendant contends that the court should have waited until the outcome of defendant's trial for the assaults upon Troope and Redmond, charges to which defendant interposed the defense of insanity. Although defendant was found not guilty by reason of temporary insanity on the charge of the aggravated battery of Troope, it must be noted that the defense of insanity was not interposed in the instant case. Additionally, the judge noted that he could

review the sentence if he believed grounds existed for such re-evaluation. He also noted defendant's "instability" and in pronouncing sentence expressly took it into account in determining the spread between the minimum and maximum sentence imposed, thereby allowing the prison authorities great latitude in determining the length of defendant's stay in prison based upon their observation of him. We, therefore, find that the timing of the judge's imposition of sentence was not improper.

■■ Defendant also contends that the sentence was excessive when considered in light of the provocation, defendant's lack of a criminal record and his work record. This sentence was however within the limits prescribed by the legislature and not at variance with the purpose and spirit of the law or in excess of the proscriptions found in the Illinois Constitution and therefore it will not be reduced. *People v. Taylor* (1965), 33 Ill.2d 417, 424 and *People v. Miller* (1965), 33 Ill.2d 439, 444—445.

The judgment is affirmed.

Judgment affirmed.

ENGLISH and DRUCKER, JJ., concur.