THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL EVANS *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 78-486, 78-629 cons.

Opinion filed December 4, 1979.—Rehearing denied February 14, 1980.

Sam Adam, Marvin I. Bloom, and T. Lee Boyd, Jr., all of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Paul C. Gridelli, and Wesley H. H. Ching, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendants Michael Evans[1] and Paul Terry, jointly tried, were found guilty of murder, aggravated kidnapping, rape, deviate sexual assault, and indecent liberties with a child. The trial court entered judgment on all of the verdicts except indecent liberties with a child which was held to have merged. Defendants were sentenced to 200 to 400 years for murder, 75 to 150 years for aggravated kidnapping, 75 to 150 years for rape, and 50 to 100 years for deviate sexual assault, each sentence to run concurrently.

Defendants appeal contending that (1) the evidence was insufficient to prove them guilty beyond a reasonable doubt, (2) prejudicial comments made by the prosecution during closing argument denied them a fair trial, and (3) the trial court erred in directing the jurors to continue to deliberate after the jurors had indicated on two occasions that they were deadlocked.

The record indicates that the victim, 9-year-old Lisa Cabassa, and her 11-year-old brother, Ricky, left their family residence at 8628 South Saginaw in Chicago on the evening of January 14, 1976, to walk home a friend who lived about five blocks away. The children walked north to the corner of Saginaw and 86th Street and then proceeded east on 86th Street. On the way, Lisa complained of a headache and decided to return home. Ricky continued walking his friend home, turning around once to

---

[1] The record indicates that defendant Evans had previously been tried without a jury and found guilty. He was granted a new trial on the basis that the State had improperly withheld evidence favorable to the defendant.

see Lisa walking west on 86th Street about a block east of Saginaw. Mrs. Cabassa testified that the children left the house at 7:45 p.m. and Ricky returned home at 8:25 p.m., at which time she inquired as to Lisa's whereabouts. After Ricky explained that Lisa returned home ahead of him, the Cabassa family engaged in an unsuccessful search for her. At about 9 p.m., they contacted the police. At 2:45 a.m. the next morning, Lisa's body was discovered in an alley a number of blocks away.

The doctor who performed the autopsy on the victim's body testified that there were abrasions on her neck, her vagina and anus were torn and bleeding, and spermatozoa was present in the rectal area. He stated that the injuries in the vaginal area were compatible with rape, and that the apparent cause of death was asphyxiation due to mechanical strangulation. It was his opinion that the injuries were inflicted by more than one person.

The evidence which linked defendants to the crime consisted of the testimony of a single witness, Judith Januszewski. Mrs. Januszewski, who was employed as a secretary at a real estate office located on East 87th Street, testified that on the night of January 14, 1976, she left work at 8 p.m. and walked home. She lived at 8547 South Saginaw Street, a block north of the Cabassa family. She proceeded east to the intersection of 87th Street and Saginaw, then north on Saginaw along the west side of the street. She testified that when she was about two or three houses from the intersection of Saginaw and 86th Street, she noticed four persons near the southwest corner. When she reached that corner, she observed two male youths struggling with a young girl. They were holding the girl's arms behind her back with the girl bent forward and she heard the girl say "No." She said the group was about 12 to 15 feet west of her and facing east toward her. The fourth person she observed was standing just off the southwest corner within touching distance of her and was facing west toward the others.

Mrs. Januszewski recognized the young girl to be Lisa Cabassa whom she had known for about one year. She recognized the male standing to the left of Lisa to be defendant Evans whom she had known for 1½ years, had spoken to on more than 10 prior occasions, had seen at least 50 times, and who lived seven houses south of her. She identified Evans at trial. As to the male standing to the right of Lisa, Mrs. Januszewski testified that she had never seen him before. She described him as wearing a dark, waist-length jacket, dark pants, high-heeled shoes, and had distinctive eyebrows. Mrs. Januszewski identified defendant Terry from a lineup in November 1976 as this person. She also identified him at trial but noted that his appearance differed in that he was wearing glasses, his hair was longer, and his eyebrows were no longer distinctive. She recognized the fourth person standing near the corner as Earl Jones,

whom she had seen on at least 20 prior occasions. She identified a James Davis in court as the person she knew as Earl Jones.[2]

Mrs. Januszewski testified that she stood at the corner and observed what transpired for about 10 to 15 seconds. She looked at the defendants for some 5 to 10 seconds. She stated that the lighting conditions were good with illumination provided by a streetlight located on the southeast corner of the intersection directly behind the spot where she was standing. She continued home and upon her arrival she looked out her window but did not see anyone on the corner. She did not contact the police or the Cabassa family that night. She stated that the next day when she learned that Lisa Cabassa had been murdered, she did not contact the police because she was scared. She did, however, talk to her mother about the incident on January 15 or 16.

Mrs. Januszewski testified that on the morning of January 16, she received a phone call at work from defendant Evans who told her if she told the police anything, the same thing that happened to Lisa would happen to her. She said she recognized defendant Evan's voice since she had heard it on numerous prior occasions, and it was distinctive in that he spoke with an occasional slur, mispronounced words, and sometimes stuttered.

On January 19, after talking to her mother, she contacted Frank Martin, who had advertised a $5,000 reward in the newspaper to persons with information regarding the murder of Lisa Cabassa and promised anonymity. She said at the time she spoke to Martin she was unaware of the reward money. Although her mother told her names would be withheld, Martin told her he would have to contact the police with her information. Later that day, Mrs. Januszewski spoke with police officers about the incident.

At about 7 p.m. that evening, police detectives took Mrs. Januszewski to the police artist. She described to the artist the two men she observed struggling with the victim as 19- to 25-year-old black males, with medium complexions, and that one of the males was wearing a hat. She did not mention to the artist that she also had observed a third male at the scene or that she knew one of the two males she described. Thereafter, at about 10:30 p.m., the detectives took her to the police station, against her wishes, in order to take her statement. Her statement indicated that she left work on the night in question at 6:37 p.m., gave a description of the two men she saw struggling with the victim, describing defendant Terry as having very black eyebrows, "like they were

---

[2] The record indicates that James Davis "otherwise called Earl Jones" was indicted along with Paul Terry on the same charges. The State nolle prossed the charges against Davis when the State's main witness against Davis renounced the information he had previously given to the State.

painted" and a light mustache. On cross-examination, when questioned about the time discrepancy between her statement and her testimony at trial as to when she left work, she denied telling the officers that she left work at 6:37 p.m. She said she told them she was unsure of the time and would verify it with her time sheets. It was later brought out at trial that her time sheets indicated she left the office that night at 8 p.m. She did not tell the detectives when they took her statement that she knew the victim or the identity of one of the males she had described. She also did not mention a third male being present. She said she intentionally withheld information from the police because she was afraid of becoming too involved. Mrs. Januszewski testified that she read her statement at the police station but did not sign it because she was afraid. She stated that at the time she gave the statement she was nervous, scared, and very upset, she was sitting in a cold and drafty room, and she wanted to leave or call her husband, but was not allowed to do so. She said that she left the police station at about 1:30 a.m., after her husband called and demanded that she be brought home.

Mrs. Januszewski testified that on January 22, 23, and 26, defendant Evans came to the real estate office sometime before noon, while she was there alone, and threatened the life of her sister, and on one occasion made a lewd comment. She said that defendant Evans again came to the office on February 13 and inquired as to why the police had been there. She said that after each visit by Evans at her office, she made the notation "ME" on her desk calendar. This calendar was admitted into evidence.

On the night of February 23, she heard glass being broken on the side of her house. The next night the man she knew as Earl Jones came to her house, called her a lewd name, and handed her an envelope which contained a note and two bullets. She contacted the police and gave these items to them. The following night she heard a pounding on the side of the house, looked outside, and saw defendant Evans leaving. She called the police and for the first time disclosed the name of defendant Evans to them as one of the men she had seen struggling with the victim. She said she finally did so because she feared that her family was in extreme danger. The next day, she was accompanied to her office by two police officers who hid in a back room. As defendant Evans walked by the office, at about 11 a.m., Mrs. Januszewski pointed him out and the officers arrested him. She stated that on March 25, someone called her, a voice she did not recognize, and told her to meet Earl at 9 p.m. at a certain location. She drove there with a police officer in the back seat of the car but did not see anyone.

During the investigation, Mrs. Januszewski was shown numerous books of photographs by the police, among which included a 1974 Bogan

High School yearbook, from which Mrs. Januszewski picked out a picture of Jeffrey Coleman as resembling the person she knew as Earl Jones. However, she did not identify Coleman as Earl Jones after viewing Coleman in a police lineup. Mrs. Januszewski did not identify defendant Terry's picture which was in the same yearbook.

The defendants did not testify in their own behalf nor present any alibi evidence. They did call several police officers as witnesses. Officer Monegiin testified that a report he made indicated that he spoke to Mrs. Cabassa on January 14, 1976, concerning the disappearance of her daughter, and she told him Lisa was last seen at 6:30 p.m. On cross-examination he stated that in his discussion with Mrs. Cabassa there was some fluctuation as to this time, and that 6:30 reflected the initial time they discussed. Investigator Leracz testified that he spoke to the Cabassa family at 4:30 or 5 a.m. the morning of January 15, 1976, shortly after Lisa's body had been discovered, and that Ricky, who was upset at the time, said he and Lisa left the house the previous evening at 6 p.m. Investigator Tuider testified that he distributed a police bulletin in the neighborhood where the incident occurred which indicated that Lisa was last seen at 6:45 p.m. on January 14, 1976. Officer Centracchio testified that he spoke with Mrs. Cabassa on the phone sometime between 4 and 12 p.m. on January 14, 1976, about her daughter's disappearance, and his report indicated that Mrs. Cabassa last saw Lisa at 6:30 p.m. that evening.

Officer Katalinic testified that he talked to Mrs. Januszewski at the police station on January 19, 1976, and she told him that she had observed two black males pulling a young girl west toward an alley on 86th Street and Saginaw; that she did not get a good look at the girl's face and was not sure whether this was an abduction or an older brother bringing his sister home; that she had seen one of the males on a couple of prior occasions but had never seen the other male before; that another black male whose name she knew was present, but she was not sure whether he was with the others; that she had known this other male for about a year and became acquainted with him when he would stop by the real estate office and speak to her and the other employees. Katalinic said he spoke with Mrs. Januszewski again on February 25, and she told him she heard a banging noise on the side of her house. He did not recall her telling him that she saw defendant Evans outside. On March 25, after Mrs. Januszewski received the phone call telling her to meet Earl at a certain location, Katalinic said he tried to arrange to have a policewoman substitute for Mrs. Januszewski, but that Mrs. Januszewski insisted on going and that he accompanied her.

Vera Larkin, Annie Thompson, and Reverend Thomas Hawkins, all friends of the Terry family for many years, testified to defendant Terry's good reputation in the community.

## I.

We first consider defendants' contention that the evidence was insufficient to prove them guilty beyond a reasonable doubt.

■■ We initially note that a reviewing court will not disturb the jury's determination of guilt unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Where the identification of the accused is at issue, the testimony of one witness is sufficient to convict provided the witness is credible and viewed the accused under circumstances as would permit a positive identification to be made. (*People v. Manion; People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631.) In determining whether an accused has been positively identified, this court has considered whether the identifying witness had sufficient time to observe the offender at a reasonable distance and under adequate lighting. (*People v. McGee* (1976), 38 Ill. App. 3d 889, 893, 350 N.E.2d 13.) Where the identification of the accused is doubtful and vague, and does not produce an abiding conviction of guilt, a conviction cannot be sustained. *People v. Clarke* (1971), 50 Ill. 2d 104, 110, 277 N.E.2d 866.

Mrs. Januszewski testified that she was about two or three houses from the intersection of 86th Street and Saginaw when she first noticed a group of people standing near the corner. She continued walking while watching the group. When she reached the southwest corner, she observed defendants struggling with a young girl she recognized to be Lisa Cabassa. She said at this point defendants were 12 to 15 feet west of her and facing east toward her so she could see their faces. Defendants point out that in her statement to the police she said defendants were 75 to 100 feet west of her. The record indicates that she gave this answer in response to the question, "where were these subjects when you saw them?" It is possible that the 75 to 100 feet referred to the distance at which she initially saw the group. She also testified that as she approached, the group was moving from the west to the east and getting closer to the corner. She said she observed the struggle for 10 to 15 seconds and looked at the defendants for 5 to 10 seconds. She also stated that illumination was provided by a streetlight on the southeast corner of the intersection. Identifications made from similar and farther distances (*People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982) and for only a few seconds (*People v. Manion; People v. Bennett* (1973), 9 Ill. App. 3d 1021, 293 N.E.2d 687; *People v. Williams* (1975), 25 Ill. App. 3d 604, 323 N.E.2d 499 (abstract)) have been upheld as positive.

■■ With regard to defendant Evans, Mrs. Januszewski had known him for 1½ years as a neighbor and had seen him on numerous prior occasions, factors which strengthened her identification of him. (*People v. Morris*

(1978), 65 Ill. App. 3d 155, 161, 382 N.E.2d 383.) However, defendant Evans argues that a reasonable doubt as to his guilt was created by Mrs. Januszewski's delay in revealing his identity to the police and relies on *People v. Roe* (1965), 63 Ill. App. 2d 452, 211 N.E.2d 552, as support.

In *Roe*, the victim named one of his assailants to the police after the incident occurred, and then 16 days later identified the defendant, whom he had known previously by name, also as an assailant. The court found it strange that since the victim knew the defendant by name, he did not name him as an assailant when he was first questioned by the police. No explanation was given as to why he delayed in revealing the defendant's name. In the present case, unlike *Roe*, Mrs. Januszewski gave fear as an explanation for her delay. She testified that after the incident occurred, defendant Evans visited her at work on four separate occasions, threatening her and warning her not to give any information to the police. On one of those occasions he asked her why the police had been at the office which indicated that Evans had been watching her. That other employees at the office did not testify as to these visits was explained by Mrs. Januszewski's testimony that the other employees did not come to the office until noon, and that Evans' visits were always in the morning when she was alone. Her office calendar, on which she wrote the notation "ME" after each visit, was introduced into evidence. There was also evidence presented indicating that Mrs. Januszewski was harassed at home, and that on one occasion she saw Evans leaving the premises. A delay in making an identification out of fear has been held to only affect the weight of the witness' identification. *People v. Orr* (1977), 45 Ill. App. 3d 660, 665, 359 N.E.2d 1237.

As to the identification of defendant Terry, Mrs. Januszewski in her statement to the police described him as a 19- to 25-year-old black male, of medium complexion and slim build, wearing a dark waist-length jacket, dark trousers, and white platform shoes, and had "very black eyebrows * * * like they were painted" and a light mustache. She identified Terry from a police lineup in November and also in court, but noted that in court his appearance differed in that he was wearing glasses, his hair was longer, and his eyebrows were no longer distinctive. There was no attempt by defendant Terry at trial to prove that his appearance had not changed, in that he always wore glasses or that he never had distinctive eyebrows. Mrs. Januszewski's failure to pick out Terry's picture from the high school yearbook which contained hundreds of pictures, and the time lapse between the incident and her identification of him from the police lineup, did not render her identification invalid but rather affected the weight to be given her identification testimony. See *People v. Green* (1976), 42 Ill. App. 3d 978, 991, 356 N.E.2d 947; *People v. Woods* (1969), 114 Ill. App. 2d 348, 355, 252 N.E.2d 717.

Defendant Terry relies on Mrs. Januszewski's misidentification of a picture of Jeffrey Coleman as the person she had previously known as Earl Jones, the third male she had seen on the corner, as indicative of her inability to make a positive identification. The record indicates that she found that the high school yearbook picture of Coleman "resembled" the man she knew as Earl Jones, but when she later viewed Coleman in a police lineup, found that Coleman was not the other man she had seen.

Defendants place primary emphasis on the discrepancy which existed in the evidence as to the time Mrs. Januszewski left her office on the night of the incident. Her statement to the police indicated that she left the office at 6:37 p.m. She testified that she told the police she believed that was the time she left but would check it out. She later obtained her time sheets from work which indicated that on the night in question she left the office at 8 p.m., and she sent this information to the police. Defendants argue that the victim's mother originally reported her daughter's disappearance at 6:30 to 6:45 p.m., and that this time was reflected in the police records. Thus, defendants argue, even if Mrs. Januszewski left her office at 8 p.m., she would not have witnessed the abduction. The police officer who first arrived at the Cabassa home that night testified that there was some confusion as to the time of the victim's disappearance. Mrs. Cabassa testified at trial that her children left the house shortly before a television program which ended at 8 p.m. was over. Thus, if the testimony of both Mrs. Januszewski and Mrs. Cabassa is believed, there is a similarity between the time the children left the house and the time Mrs. Januszewski left her office.

The evidence here indicates that Mrs. Januszewski was afforded an adequate opportunity to make a positive identification of the defendants. Defendants' arguments focus mainly upon Mrs. Januszewski's credibility, a matter left for determination by the trier of fact who holds the superior position of hearing the evidence and observing the demeanor of the witnesses. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) Upon careful review of the record, we find that Mrs. Januszewski's testimony, if believed, was not so improbable, doubtful, or vague as to raise a reasonable doubt as to defendants' guilt.

## II.
### A.

We next consider whether certain comments made by the prosecutor during closing arguments denied defendants their right to a fair trial. The State initially contends that defendants failed to properly preserve this issue for review by their failure to specify the comments complained of in their motions for new trial. The record indicates that defendant Evans filed a written motion for new trial but failed to set out the particular

comments about which he now complains. Defendant Terry made an oral motion for new trial. Neither of the defense attorneys mentioned the alleged prejudicial comments at the proceeding held on the motions for new trial.

■■■ With regard to defendant Evans' written motion, section 116—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 116—1) provides that a written motion for a new trial shall be filed by the defendant within 30 days following the return of a verdict and shall specify the grounds therefor. The failure to set out with specificity the errors complained of in a written motion for new trial constitutes a waiver of those issues for purposes of appeal. (*People v. Rowe* (1977), 45 Ill. App. 3d 1040, 1044, 360 N.E.2d 436; *People v. Virgin* (1973), 9 Ill. App. 3d 902, 906, 293 N.E.2d 349.) The salutory purpose of the rule is to provide the trial court an opportunity to correct alleged errors, thus eliminating unnecessary reviews and reversals, and to give the reviewing court the benefit of the trial court's judgment. (*People v. Irwin* (1965), 32 Ill. 2d 441, 443-44, 207 N.E.2d 76.) However, where, as in the present case, an issue has in fact been brought to the attention of the trial court, ruled on by the trial court, and involved the potential of substantial prejudice to the defendant, this court has, in its discretion, relaxed the waiver rule and considered the issue on its merits. (*People v. Gray* (1977), 47 Ill. App. 3d 1026, 1032, 365 N.E.2d 501.) Although defendant Evans waived the issue by failing to specify the complained of comments in his written post-trial motion, we will nevertheless consider the issue on its merits.

■■ The requirements under section 116—1 have not been applied in a situation where a defendant makes an oral motion for new trial as defendant Terry did here. It has been held that an oral motion for new trial preserves all errors for review unless the State objects and requests that the grounds be specified as in a written motion. (*People v. Whitehead* (1966), 35 Ill. 2d 501, 503-04, 221 N.E.2d 256; *People v. Houck* (1977), 50 Ill. App. 3d 274, 280, 365 N.E.2d 576.) In *Houck*, even though defendant in his oral motion stated four grounds for review, this court found that in the absence of some notice to the defendant that the State was requesting the specificity of grounds required in a written motion, it would not limit its review to the parameters of the oral motion for a new trial. The State here, by its failure to object to defendant Terry's oral motion and request the specificity as required in a written motion, has waived the requirements of a written motion.

## B.

Defendant Evans contends he was denied his right to a fair trial when the prosecutor during closing argument suggested to the jury that Evans had a prior criminal background when in fact there was no evidence that

Evans had been convicted or even arrested for any prior criminal offense. Defendant Evans objects to the prosecutor's following statements:

"You know there are some things that we are confined by rules of evidence to, that we are not allowed to bring before the jury. I think it is exceptionally unfair, and I'll state it in your presence as well as the attorney's presence who just said it to me, to indicate to you that we did not prove something that by a rule of evidence we would be precluded, in other words, prohibited from proving. There is a great deal you might want to have heard. We can not present evidence of the matter Mr. Adams mentioned—."

Before a ruling was made on defendant's objection to this comment, the prosecutor continued:

"Mr. Adam mentioned the passed [sic] conduct of Michael Evans, we are not able to go into that. It is considered prejudicial, we couldn't do it, it would be a mistrial, we can't do it. But why did he—."

An objection was again made which the court overruled stating, "You opened the door, counsel."

The record reveals that these statements were provoked by defense counsel's comments in closing argument when defense counsel rhetorically asked:

"Have they brought you any conduct by Michael Evans, anything about Michael Evans that would justify believing that he had been involved in this? Anything about his whole life of seventeen now eighteen years. One fact in this man's life, this young man's life, that would justify in saying this is a kind of person that would do this. No."

It is well established in Illinois that when defense counsel by his argument invites or provokes a response on the part of a prosecutor, he cannot complain that he has been prejudiced by the response (*People v. Lewis* (1962), 25 Ill. 2d 442, 446, 185 N.E.2d 254; *People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 568, 374 N.E.2d 904; *People v. Reyes* (1970), 131 Ill. App. 2d 134, 140, 266 N.E.2d 539), even when the prosecutor's statements would be otherwise improper (*People v. Woodley* (1965), 57 Ill. App. 2d 380, 388, 206 N.E.2d 743). This rule has been applied in situations where a prosecutor has made insinuating remarks which in the absence of invitation or provocation would be held improper. (See *People v. Hasting* (1978), 56 Ill. App. 3d 724, 372 N.E.2d 702; *People v. Reyes.*) An exception to this rule exists where the prosecutor's argument was so prejudicial as to have deprived a defendant of a fair trial. *People v. Bolton* (1976), 35 Ill. App. 3d 965, 973, 343 N.E.2d 190.

Improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused (*People v. Nilsson*

(1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881), or constitute a material factor in the conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363); the test being whether the jury would have reached a contrary verdict had the improper remarks not been made (*People v. Naujokas* (1962), 25 Ill. 2d 32, 38, 182 N.E.2d 700).

Defendant Evans argues that because of the closeness of the case and the fact that the jury was not admonished to disregard the prosecutor's remarks, it cannot be said with certainty that the jury would have convicted the defendant had the remarks not been made. Defendant relies on *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164, and *People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14, as authority for finding that the prosecutor's remarks constituted reversible error.

In *Patterson*, the prosecutor, obviously referring to the defendant, stated, "You learn things after you have been convicted of a robbery once, after you have been arrested for armed robbery, and convicted of various—." An objection to this comment was sustained. This court found that the prosecutor's assertion that defendant had been "convicted of various—" could only have referred to previous convictions of various crimes, which comment was severely prejudicial since defendant was entitled to have his guilt or innocence determined solely with reference to the crime charged. In addition to this remark, other substantial and repeated prejudicial insinuations not based on the evidence were made over defense objections which had been sustained. The court held that the cumulative effect of the enumerated trial errors constituted a denial of a fair trial.

In *Dukes*, the prosecutor repeatedly referred to the fact that defendant used an alias, which the court found was not based on any evidence in the case and left the jury to speculate on the insinuation that defendant had a prior record without stating what it was. In addition to this error, the court in *Dukes* found several other prejudicial errors in the admission of testimony and remarks in closing argument which included the emphasis by the prosecutor of the deceased's family, the fact that the prosecutor referred to his personal knowledge of the good qualities of the deceased when no such evidence had been presented, and the prosecutor's implication that the arresting officer had a right to take the defendant's life but spared it so that the jury could impose the death sentence. In its decision the court noted that where the jury imposes the death penalty, as they did in *Dukes*, the errors complained of assumed increased importance.

As pointed out in *Patterson* and *Dukes*, a remark not based on the evidence and which suggests that defendant had a prior record of crime is

improper and prejudicial. The prosecutor's statement here, not based on the evidence, and suggesting that there may have been something in defendant Evans' past which would indicate that he was the type of person to commit the crime with which he was charged was improper. However, the question remains as to whether this suggestion provoked by defense counsel was so prejudicial as to deny defendant Evans a fair trial.

In *People v. Reyes*, a case more similar to the present case than either *Patterson* or *Dukes*, defense counsel in closing argument argued that the State did not show that defendant had ever been convicted of any crime. In rebuttal the prosecutor responded that the State was prohibited from introducing any evidence about defendant's criminal record. On appeal, defendant argued that the prosecutor improperly implied that defendant had a criminal record. In affirming defendant's conviction, this court found that defendant had invited the prosecutor's response and could not complain that he had been prejudiced by it.

Defendant distinguishes *Reyes* on the basis that the court sustained the objection to the prosecutor's statement and instructed the jury to disregard the remark, whereas in the present case, the objection was not sustained. Although the act of promptly sustaining the objection and instructing the jury to disregard the statement has usually been viewed as sufficient to cure any prejudice (*People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200, and cases cited therein), the fact that such action was not taken does not in itself require reversal. Each case must be decided upon its own facts. *People v. Baptist* (1979), 76 Ill. 2d 19, 29.

● 8 Here, the comment about which defendant complains was an isolated one as opposed to the series of repeated and seriously prejudicial comments made in both *Patterson* and *Dukes*. The record does not show an effort by the State to exploit the statement. The trial court properly admonished the jury both before closing argument and in the instructions that they should disregard any statements made by the attorneys which were not based on the evidence. Defendant Evans had been positively identified by a witness who had known him as a neighbor for 1½ years and had seen and spoken to him on numerous prior occasions. There was also evidence that defendant Evans threatened this witness with the victim's fate if the witness gave the police any information. In view of these circumstances, we are unable to say that the verdict would have been otherwise had the prosecutor's remarks not been made.

### C.

The comment about which both defendants complain was made by the prosecutor in his rebuttal argument when he said:

"I don't ask for any sympathy. They tell you we are trying to

poisen [*sic*] your minds by showing you the heinousness of the offense. You should have seen all the evidence we kept out of this offense."

After the objection to this comment was sustained, the prosecutor then told the jury that neither sympathy nor prejudice should enter into their deliberations, and that their verdict should be reached after considering the totality of the evidence.

■■ Defendants argue that by telling the jury that they should have seen all the evidence the State kept out of the case, the jury was allowed to speculate on what the other evidence would have been and could have construed the comment as meaning that the prosecutor knew of evidence that could not be presented to the jury but showed the defendants' guilt.

While we find such a comment not based on the evidence to be improper, before it is sufficient to merit reversal it must be of substantial magnitude when viewed in light of the entire record and argument. *People v. Odum* (1972), 3 Ill. App. 3d 538, 545, 279 N.E.2d 12.

Upon examination of the record we find that the attorney for defendant Evans told the jury that the State was asking them to find the defendants guilty because of the gruesome nature of the crime, and at another point told them the State was appealing to their emotions by stressing the heinousness of the crime as an attempt to make up for the lack of evidence against defendants. The attorney for defendant Terry told the jury they would see pictures of the victim that would shock them but not to let the heinousness of the crime affect their judgment nor let their feelings of sympathy or prejudice interfere with their reasoning in the case.

The prosecutor's comment was made in the nature of a response to these arguments and with reference to other evidence the State had which concerned the brutality of the crime. In its context, we do not believe the prosecutor's remark conveyed the meaning which defendants attribute to it. While such a comment is not to be condoned, it was not of such magnitude as to require reversal. Moreover, the objection to the statement was immediately sustained, thus minimizing any prejudice that may have resulted, and the jury was instructed to disregard any statements by counsel not based upon the evidence.

## III.

■■ Defendants lastly contend that the trial court erred in directing the jurors to continue to deliberate when they had indicated on two separate occasions that they were deadlocked, and in refusing to grant defendants' motions for mistrial.

The record indicates that on April 26, 1977, at 2 p.m., the jury began its deliberations. No decision having been reached by 7 p.m. that evening,

the jury was sequestered for the night. The jury resumed deliberations at 10 a.m. the next day. At 11:45 a.m., the jury sent a note to the court which stated, "We are deadlocked unalterably. What shall we do?" The court responded, "It is your duty to continue to deliberate." At 3:50 p.m., the court received another message from the jury which stated, "In almost four additional hours of deliberations we cannot reach a unanimous decision." Both defense attorneys moved for a mistrial. The court denied the motions and responded to the jury, "Continue to deliberate, Judge Barbaro, 4:15 p.m." At 4:45 p.m., the jury sent a note to the court which read, "May we have a clarification of the law as outlined in the instructions? If we find the defendants guilty of kidnapping does it automatically follow that we must find them guilty of the other charges?" Both defense attorneys again moved for mistrials, and defendant Terry's attorney suggested that the jury be brought into court and questioned by the trial judge. The court denied the motions and responded to the jury, "You have the instructions as to the law that is applicable." At 6:10 p.m., the jury reached its verdicts. At the request of both defense attorneys, the jury was polled and each juror responded affirmatively to the question, "Was this and is this your verdict?"

Defendants argue that the effect of the trial court's instruction to continue to deliberate instead of giving the jury the deadlock instruction as approved in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, was to unconstitutionally coerce a jury verdict. Defendants contend their argument is supported by the affidavit of the forewoman of the jury in which she indicated that the jurors were under the impression that they would be sequestered until they reached a verdict, and that the minority of jurors who voted for acquittal, of which she was one, thought that they would eventually have to give in.

We initially note that neither defense attorney requested that a *Prim* instruction be given although they had opportunities to do so. The length of time that is reasonable to permit deliberations to continue in a case is a matter which rests in the sound discretion of the trial court, and its judgment in this regard will not be disturbed unless this discretion is shown to have been clearly abused. *People v. Daily* (1968), 41 Ill. 2d 116, 121, 242 N.E.2d 170, *cert. denied* (1969), 395 U.S. 966, 23 L. Ed. 2d 752, 89 S. Ct. 2112; *People v. Bravos* (1969), 114 Ill. App. 2d 298, 314, 252 N.E.2d 776, *appeal denied* (1969), 42 Ill. 2d 538, *cert denied* (1970), 397 U.S. 919, 25 L. Ed. 2d 100, 90 S. Ct. 927; *People v. Alexander* (1973), 15 Ill. App. 3d 607, 613, 305 N.E.2d 61.

In *Daily*, after 6½ hours of deliberation, the foreman informed the judge that they had not reached a verdict and that the voting had not changed in the preceding two or three hours. The judge recommitted

them for further deliberations and shortly thereafter the jury reached a verdict. In holding that the jury verdict had not been coerced by the trial court, the supreme court noted that the presentation of the case had taken four days with 31 witnesses presenting conflicting evidence, and that the trial court properly exercised its discretion in directing the jury to continue to deliberate.

In *Bravos*, the jury deliberated for eight hours and then retired for the night. One hour after deliberations recommenced the next morning, the foreman announced that the jury was " 'completely deadlocked, eleven and one. We are no further than we were last night at midnight, no further along, and there's nothing we can do about it. The party just don't believe the case was proven. We sat and talked, and that's it.' " (114 Ill. App. 2d 298, 311.) The judge ordered the jury to continue deliberating and denied a defense motion for a mistrial. Six hours later, the verdict was returned. On review, this court finding no coercion stated that defendants were not entitled to relief simply because a juror was ultimately persuaded to join in the decision, and noted the fact that a decision not immediately forthcoming after deliberations were resumed tended to distract substantially from the argument that the decision was coerced by the trial judge.

And in *Alexander*, after a two-day trial and four hours of deliberating, the jury notified the court that it could not reach a verdict. The trial judge refused to give a deadlock instruction or call the jury out for questioning and directed the jury to continue to deliberate. The jury, 1½ hours later, informed the court that it could not reach a verdict, and one juror stated that he did not think further deliberation would do much good. The judge sequestered the jury for the night. The next morning, after deliberating for one-half hour, the jury reached a verdict. On appeal, the court rejected defendant's contention that the trial judge had coerced the verdict and found that the judge properly exercised his discretion.

In the present case, the trial spanned over a 7½-day period. Each defendant had been charged with five separate offenses. The jury was given 20 verdict forms, 10 for each defendant, and had to decide complex issues of felony murder and accountability. The jury deliberated for about 12 hours before reaching a verdict. The fact that it was over an hour before the jury returned its verdict after being told to continue to deliberate the second time must also be considered. Based upon these circumstances and the foregoing authorities, we cannot say that the trial court abused its discretion.

Furthermore, based upon the recent case of *People v. Preston* (1979), 76 Ill. 2d 274, 391 N.E.2d 359, the trial court here properly refused to consider the affidavit of the forewoman which was submitted by

defendants with their post-trial motions. In *Preston*, the defendant attached to his post-trial motion what he termed a discovery deposition taken of a juror after judgment had been entered and the jury discharged. In the deposition, the juror stated that while the other jurors believed defendant was guilty of the charges of murder and armed robbery, she did not believe him guilty of either, and that she finally agreed to sign a verdict of guilty of murder upon the agreement of the other jurors to return a verdict of not guilty of armed robbery. The supreme court held that while testimony or an affidavit of a juror could be admitted for the purpose of showing that the jury had made a private investigation into the evidentiary matters bearing on an issue in the case, thus availing itself of information which the defendant had no opportunity to refute, it could not be admitted for the purpose of showing the motive, method, or process by which the jury reached its verdict. The court, quoting from *United States v. Schroeder* (8th Cir. 1970), 433 F. 2d 846, *cert. denied* (1971), 401 U.S. 943, 28 L. Ed. 2d 224, 91 S. Ct. 951, stated:

> " 'After a jury has given its verdict, has been polled in open court and has been discharged, an individual juror's change of mind or claim that he was mistaken or unwilling in his assent to the verdict comes too late. * * *' " 76 Ill. 2d 274, 288.

Here the jury verdicts had been rendered and the jurors polled with each juror responding affirmatively to the question "Was this and is this your verdict?" The alleged affidavit was not obtained until after the jury had been discharged. So far as we can determine, the securing of the affidavit was an *ex parte* procedure with no notice to the State or opportunity for its representative to be present. It does not refer to any extraneous or outside influence and describes only the method and motive by which the forewoman and other jurors in the minority reached their verdicts. Under these circumstances, the affidavit could not be considered.

Based upon the foregoing, the judgment of the circuit court of Cook County as to each defendant is affirmed.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.