THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BEN ALEXANDER, Defendant-Appellant.

(No. 57699;

First District (1st Division)—October 22, 1973.

James J. Doherty, Public Defender, of Chicago, (Saul H. Brauner and Ian Levin, Assistant Public Defenders, of counsel,) for appellant.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and Roger L. Horwitz, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendant, Ben Alexander, was found guilty by a jury of the murder of Robert Stephen and sentenced to 14 to 28 years. The issues are whether the trial judge improperly influenced the jury and whether the defendant was proved guilty beyond a reasonable doubt.

Roosevelt Bowens had known the deceased, Robert Stephen, since 1964. He had known the defendant, Ben Alexander, for about 15 months but did not know his last name until after Stephen was killed. On July 13, 1971, he was employed by Brown Moving Van and was on his way to work when he met Stephen at 7:00 A.M. at Ella's Lounge, where his boss, Mr. Brown, picked him up each day. Brown arrived and told him that the job they had that morning was postponed. Bowens went to a number of taverns all day and drank a couple of pints of wine, to which, he testified, he limited his daily drinking.

Ella's Lounge is located at 114 West 95th Street in Chicago, and Bowens had been in there several times that day. He saw the defendant at about six that evening when the defendant parked what looked like a cement truck across the street from the tavern.

At 9:50 P.M. Bowens was standing between Ella's Lounge and a tavern called Big Deal located at 116 West 95th Street. There were about six people that he knew, who were talking in front of the tavern. Stephen was not in the group but was down the street somewhere. The street was fairly busy, and there was much noise and traffic. He next saw the defendant talking to Robert Stephen on 95th Street about 25 or 30 feet from him. There were three other people whom he did not know, including a little boy, with the defendant and Stephen. He did not see anything in the defendant's hand and he could not hear the conversation.

When they finished talking, Stephen came back going west and then went down the street. The defendant went east on 95th Street. Stephen told Bowens that "the man said he was going to get his shit." Bowens thought that this meant that the defendant was going to get a weapon.

About 10 or 12 minutes later he saw the defendant again, coming west on 95th Street on the same side of the street that the tavern was located and did not see anything in the defendant's hand when he first approached the tavern. When Bowens saw the defendant coming, he went across 95th Street from the north side to the south side "because of what was said where [he] was standing." When he got to the other side of the street, he heard a shot and looked around. He saw four people in front of the tavern, Cat Eyes, the defendant, Melvin Perry, and Robert Stephen. Stephen and the defendant were standing, and the other two were sitting. The defendant was moving from a tree closer to Ella's Tavern, and Bowens saw the firing of a pistol and heard a number of shots. He testified as follows:

"Q. Did you see who held the pistol at this time?

A. Yes, I saw the man holding the pistol.

Q. Do you know who that man was?

A. Well, at that time I did not know who it was until it was over."

He saw Robert spin around and hit against Ella's Tavern and slide to the ground. He saw a man standing over Robert, heard another shot, remained where he was, and the man who was standing and leaning over Robert walked away. He was never asked who that man was. On direct examination the following occurred:

"Q. Now, when you first saw the defendant Ben Alexander approaching the tavern where you were standing and upon your going across 95th Street, did you see anything in the hands of the defendant, Ben Alexander?

A. From the distance where I was standing and from where he was walking, coming towards the tavern, I couldn't see anything in his hands.

Q. When *he* left the place where Robert was laying, did you see in which direction he walked?

A. He went east on 95th Street." (Emphasis added.)

Lewis Harden, who was 75 years old at the time of trial, was standing in the vicinity when he heard four shots but did not know where they were coming from. He saw a man falling that he later learned was Stephen. He testified he saw the defendant come from behind the tree and stand over the body; then the defendant put a pistol in his pocket

walking toward his home. The defendant returned, looked at the body, and walked away again.

Melvin Perry was also in the vicinity and had been drinking. He testified that he saw the defendant fire a shot into the side of the building and then another shot into the air. At the time he was 12 feet from the defendant. The next shot the defendant fired hit Stephen in the chest. Stephen spun around and fell on the sidewalk about a foot away from Perry. After he fell the defendant bent over him and shot Stephen in the head. He did not hear any words between the defendant and Stephen during the shooting. The defendant left, returned, looked at Stephen and left again. When he returned, Perry did not see him with a gun. On recross examination he testified that he had given a statement to the police in which he said that Stephen told him that the defendant was going home to get a gun; and a short time later the defendant came back with a gun in his hand and said: "Now start messing with me. [And] Robert said I'm not bothering." In that statement he also said that Stephen started to move around Ben and that was when Ben fired at him; Ben then walked away and went across the street and down Perry toward his house.

The coroner's physician testified that Robert Stephen had a bullet wound in the chest and one above and in front of the left ear. He recovered a bullet from the right side of the back of the brain.

The defendant testified that he lived at 9637 South La Salle, about three-quarters of a block west of Ella's Tavern. On July 13 he quit work at 5:10 or 5:15 P.M. and was dropped off at Ella's at about 5:20 or 5:30 P.M. He drank some beer and whiskey and left some time after 9:00 P.M., although he does not recall the exact time. When he walked out of Ella's Tavern he did not see anyone lying on the sidewalk. He crossed 95th Street and proceeded south on Perry Avenue to his home. When he was in the middle of the block, he heard some noise which sounded like gunfire or the backfire of an automobile. He did not walk back to see what it was. When he got to 96th Street, a squad car pulled up and asked what his name was. When he told the officers his name, they told him he was the one that did the shooting on 95th Street. He returned to the tavern and noticed a man lying on the sidewalk. He knew that man from being around the tavern but did not know his name. He denied having any trouble with the deceased and denied shooting him.

We disagree with the defendant's contention that he was not proved guilty beyond a reasonable doubt. In substance, he argues that so many contradictions and inconsistencies appear in the testimony of the three eyewitnesses they are not worthy of belief as a matter of law. It would

unduly lengthen this opinion to answer each attack on specific aspects of the testimony. It is enough to say that whether Harden did or did not have something to drink is not controlling; nor is the fact that the witnesses differed in their recollection of the times certain things occurred. The defendant was drinking, and he was unable to remember the exact time he left the tavern.

■■ All three witnesses said that they had known both the defendant and the deceased for some time. Harden and Perry testified that the defendant had a gun; although Bowens' testimony is ambiguous, it could be understood to mean that he saw the defendant fire the shot. Perry's testimony is not ambiguous: He saw the defendant fire the shots into Stephen. If believed, the State's evidence shows the defendant guilty beyond a reasonable doubt; and, although some of the State's evidence could be considered conflicting, it was for the triers of fact to resolve any inconsistencies. *People v. Zuniga*, 53 Ill.2d 550, 293 N.E.2d 595.

The trial took two days. The jury retired at 4:38 P.M., went to dinner at 5:20 and returned at 6:00. At about 9:25 P.M. the bailiff handed the court a slip of paper he had received from one of the jurors which read: "Can't reach verdict." All counsel were called and advised of the situation. The various alternative methods of procedure were discussed. When the attorney for the defendant objected, the judge ruled that he would not give instruction 1.05 of the Illinois Pattern Instructions for Civil Cases which, the defendant now argues, would have been an "Allen charge." We agree; but, in view of the fact that the judge did not give the instruction, our agreement is academic. The judge then said that he would permit the jury to continue to deliberate and review the situation later. The following occurred:

> "DEFENSE ATTORNEY: If I may make an observation, the jury has told us they cannot reach a verdict. If we do not say anything to them they may not even proceed to attempt to reach a verdict and perhaps they should be told to continue to deliberate.
>
> THE COURT: How would you propose to say that?
>
> DEFENSE ATTORNEY: I have no suggestions.
>
> DEFENSE ATTORNEY: Judge, how long would you let the trial go before you declared a mistrial?
>
> THE COURT: I haven't really given that any thought. I have no fixed feelings. Anybody have any questions or suggestions?"

One of the defense attorneys then suggested to the judge that he bring the jury out and ask for an explanation of the note and whether continued deliberation would be hopeless. The court refused to call the jury out stating, based on his experience, that it would be inappropriate to

call them out and ask them to explain because "if you start having someone talk, it is difficult to ascertain what you are going to get in response to such a question." At 11:00 P.M. the jurors informed the bailiff that they had not reached a verdict. When the judge informed the attorneys, one of the defense attorneys moved for a mistrial. The State's Attorney objected. The trial judge stated that in his opinion no further deliberations would be meaningful at that time but that the interests of justice would not be abused by sequestering the jury and having further deliberations resumed at 10:00 the following morning. One of the defense attorneys then asked if the court would ask the jury if sequestration and additional time would do any good or whether at that point, no matter how much time was given, they would remain hopelessly deadlocked. This the court refused to do. The defense attorney then said: "Judge, the only statement I want to make for the record is for many of these people being sequestered may produce a coerced verdict whether it be for the State or for defense. I really don't know, but it concerns the defense."

When the jurors were called out into open court the following occurred:

"THE COURT: Ladies and gentlemen, the Court understands that you have not reached a verdict. The Court is going to terminate the deliberations at this time and you will be lodged for the evening in rooms provided by the Sheriff of Cook County, and resume deliberations tomorrow morning at 10:00 o'clock.

Now, if any of you have automobiles that are on the street or someplace that are not in safekeeping you will advise the bailiff and go down when you are transferred over to the place of lodging. You will be escorted to your car and so that the car can be moved to a place of safekeeping so that we will have a recess in deliberations until tomorrow morning at 10:00 o'clock.

A JUROR: I don't think that is going to do much good, your Honor.

THE COURT: We do not want to get into any discussion of the matter.

A JUROR: All right.

THE COURT: We would ask that the matter be recessed until tomorrow morning, 10:00 o'clock.

A JUROR: Fine.

THE COURT: Good night.

\* \* \*

DEFENSE ATTORNEY: This is the third time the Court has been told any further deliberations would be no good. This was

said at 9:25, 11:00 o'clock and now at 11:15 in open court, that further deliberations would do no good; at this point, *I am merely suggesting to the Court* that in view of the three very, very affirmative statements, one written and two oral, that further sequestering these people or forcing them to reach a verdict may produce a wrong verdict either for or against the defendant." (Emphasis added.)

The jurors were sequestered that night in the House of Correction and returned at 9:45 A.M. the following morning. At 10:15 A.M. they informed the bailiff that they had reached a verdict.

The defendant argues that the court erred by failing to declare a mistrial after the jury twice reported it could not reach a verdict; by his silencing a juror "who declared that further deliberations would be useless"; and by his sequestering the jury at a jail facility without admonishing the jury to refrain from discussing the case during the overnight recess.

■■ First, the length of jury deliberation rests within the sound discretion of the trial judge, and we find no abuse of this discretion under the circumstances disclosed here. (See *People v. Daily,* 41 Ill.2d 116, 242 N.E.2d 170; *People v. Bravos,* 114 Ill.App.2d 298, 252 N.E.2d 776; *People v. Kinzell,* 106 Ill.App.2d 349, 245 N.E.2d 319.) Second, the record does not show, as the defendant argues, that the juror "declared that further deliberations would be useless," but rather that he didn't think it was "going to do much good." Since the judge had already decided that the jury was to be sequestered, no purpose would be served by talking to the jurors. Indeed, we agree with the court's observation, based on his experience, that prudence requires extreme care in engaging in colloquy with deliberating jurors in open court. Last, no request to admonish the jurors was made by the defense, and, most important, there is no suggestion in the record that the jurors did discuss the matter when sequestered. Moreover, the defense has not cited any case that holds it reversible error for jurors, when sequestered, to discuss the case *among themselves only.*

The New York cases cited by the defendant are inapposite, because New York has a statute which requires a judge to answer a juror's questions (Code of Criminal Procedure, Section 427); and no question was asked by the jurors in this case. *Cf. People v. Gezzo,* 307 N.Y. 385, 121 N.E.2d 380; *People v. Gonzalez,* 293 N.Y. 259, 56 N.E.2d 574.

For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

GOLDBERG and HALLETT, JJ., concur.