THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY ALLEN, Defendant-Appellant.

First District (1st Division)   No. 62652

Opinion filed April 11, 1977.

James J. Doherty, Public Defender, of Chicago (Leonard V. Solomon, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Edward D. Stern, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BUA delivered the opinion of the court:

The defendant was indicted for murder and was tried before a jury in the Circuit Court of Cook County. The jury returned a verdict of guilty, and the court imposed a sentence of imprisonment for a term of from 40 to 100 years. On appeal, the defendant-appellant contends that under the circumstances the trial court erred in refusing to instruct the jurors that they could be discharged without reaching a verdict.

The testimony of various witnesses indicated the following to be the relevant facts. On June 22, 1974, William Moore, James Grady, Johnnie Stuckie, and a man known only as "Lee" shared an apartment at 3725 South Indiana, in Chicago. Lee was a heroin dealer and the other three men were addicts or users of heroin. At about 5:30 p.m. on that day, the four men were in the apartment, together with Freddie Vic, Leroy Turner, and a girl named Rose. Lee began to accuse those living in the apartment of stealing some of his heroin. He questioned them, and after searching the house, left, threatening "trouble" if the heroin was not found by the time he returned. Lee was gone only a short time. Just after he returned a man named Will Sullivan entered the apartment and began to question the occupants concerning the missing narcotics. Sullivan was armed. He said that he was going to go and get his "people" and that someone would be "hurt bad" if the heroin did not turn up by the time he came back. Lee and Sullivan then left the apartment and returned, followed by two men, one of whom was later identified by Moore, Turner, and Stuckie as the defendant, Jerry Allen. Stuckie, Moore, Grady, Turner, and Vic were summoned to Lee's bedroom, where Sullivan and Allen held them at gunpoint. Allen questioned the men about the narcotics. After unsuccessful attempts by Allen and Sullivan to recover the heroin or get any of the five men to admit to stealing it, Allen became upset. At this point, according to witnesses, Allen said, "I'm tired of this," placed a pillow from the bed in front of his gun, and fired a shot into Grady's chest. Grady fell over on the bed where he had been sitting and was later laid on the floor. After threatening to kill the others as well if the heroin was not soon recovered, Lee, Sullivan, and Allen left the apartment. The police were called.

On July 3, 1974, Moore and Turner each identified Jerry Allen from a group of police photographs as the man who had killed James Grady. After Allen's arrest, Moore also viewed and identified Allen in a lineup.

The jury began its deliberations at about 3 p.m. on January 13, 1975. After approximately six hours, at about 9 p.m., the judge called the jury back into the courtroom and asked the foreman whether he felt that a verdict might be reached within the next hour. The foreman answered affirmatively, and deliberations resumed for about 45 minutes. At that point the jury sent a note to the court which read, "We are unable to reach a verdict. What is the alternative?" The judge again called the jury into the courtroom. He told the jurors that they would be spending the evening in the jury quarters and would continue their deliberations in the morning. When the jury had gone, defense counsel asked that the following morning the court instruct the jurors that if they could not reach a verdict they could be discharged without ever doing so. This request was denied.

The next morning, January 14, 1975, the jury began its deliberations at about 10 a.m. Just before the jury went to lunch the foreman sent a second note to the court. At about 2 p.m. the court informed counsel for both sides of the situation and of his plans regarding further deliberations by the jury, saying:

"For the record, what I am going to do at this time * * *. Before lunch, I have received a further note from the jury. They handed it to the Bailiff, which says:

'We, as the jury, are deadlocked and cannot see any possibility of reaching a verdict.

The Foreman.'

With that in mind they went to lunch. They returned approximately a half an hour ago. At this time I am going to read *People v. Prim*, which will be taken from 53 Ill. 2nd, 62. Thereafter, I will send the jury back and see if they can reach, after reading the instruction to them—I will call them out at approximately an hour and a half, two hours, and see if they have progressed any further in reaching a verdict before I declare it a hung jury."

Defense counsel asked that in addition to reading the supplemental instruction for deadlocked juries set forth in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, the court inform the jurors that they could be discharged without reaching a verdict. The court refused to do so. In accordance with *People v. Prim*, the court then called out the jurors and addressed them as follows:

"Your verdict here must represent the considered judgment of each juror. In order to return a verdict, it is necessary for each juror

to agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with each other and to deliberate with a view to reaching a verdict if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans, you are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

So, with that in mind, I want you to go back and I will see in a while longer if you are any closer to a verdict.

You may go back and continue your deliberations at this time."

After returning to its deliberations for 1 to 1½ hours, the jury returned a verdict of guilty as charged. Judgment was entered on that verdict, and the court imposed a sentence of imprisonment for 40 to 100 years.

It is the defendant's contention that the trial court, under these circumstances, committed reversible error by failing to instruct the jurors that they could be discharged without reaching a verdict. The essence of the defendant's argument is not that the court erred in charging the jury as provided in *People v. Prim*. Rather, it is argued that given the full context of prior events, the court's failure to go *beyond* the *Prim* charge and give further explanation to the jury may have resulted in a coerced verdict. Specifically, the defendant points to the jury's express inquiry as to the "alternative" to apparent deadlock, the court's response in telling the jury only that they would be sequestered for the evening in jury quarters, and the overall length of the deliberations. Under these circumstances, it is argued, it was not unrealistic to assume that some jurors might have felt that failure to reach a verdict would result in continued nights of confinement, and it therefore became the duty of the court to expressly dispel any such feelings.

While this argument raises a somewhat novel issue in this court, we are not left entirely to our own judgment in reaching a decision. In *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, the Illinois Supreme Court clearly indicated that when dealing with a possibly deadlocked jury, the Illinois courts should comply with the provisions of section 5.4 of the Standards Relating to Trial by Jury promulgated by the American Bar Association Project on Minimum Standards for Criminal Justice. Section 5.4 reads:

"5.4 Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberation and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." ABA Standards at 145-46.

In addition, there exists a sizeable body of other case law dealing with the problems of jury deadlocks in a manner fully consistent with the above-quoted guidelines. Analysis of the present situation in light of these authorities leads us to reject the defendant's contention.

■■ As indicated, one of the factors which the defendant emphasizes in arguing that the jury was in effect coerced to reach a verdict is the overall length of the deliberations. Turning first to this factor, we do not feel that it can be said to have in itself rendered the jury's verdict a product of improper coercive influence. This follows necessarily from the fact that the trial court did not, as forbidden by paragraph 5.4(b) of the ABA Standards, require the jury to deliberate for an unreasonable length of time or for unreasonable intervals. The question of what length of time it is reasonable to permit deliberations to continue in any case is a matter peculiarly within the discretion of the trial judge. (*People v. Daily* (1968), 41 Ill. 2d 116, 242 N.E.2d 170; *People v. Wilson* (1976), 37 Ill. App. 3d 560, 346 N.E.2d 161; *People v. Bravos* (1969), 114 Ill. App. 2d 298, 252 N.E.2d 776.) The jury's own view of its ability or inability to reach a verdict is but

one factor to be considered in the exercise of that discretion. Thus, under proper circumstances, it is within the court's discretion to permit further deliberations after the jury has expressed the view that it is "hopelessly deadlocked" (*People v. Daily*), or to sequester a jury which has on more than one occasion indicated that it cannot reach a verdict. *People v. Alexander* (1973), 15 Ill. App. 3d 607, 305 N.E.2d 61.

■■ In the present case the charge was murder, and the presentation of evidence before the jury, including the testimony of several witnesses, took the better part of 4 days. After deliberating between 6 and 7 hours, the jury indicated its feeling of deadlock. The court then sequestered the jury for the evening, and deliberations resumed for about 2 hours on the following morning. At that point the jury again indicated, in somewhat stronger terms, its inability to reach a verdict. The court's response was to charge the jury as provided in *People v. Prim* and request it to deliberate further, with the intention of waiting about 2 hours before declaring a mistrial. A verdict was reached approximately 1½ hours after the supplemental charge. Under these circumstances it cannot be said that the trial court abused its discretion by requiring unreasonable deliberations.

■■ Given our finding that the trial court did not abuse its discretion in requiring the jury to deliberate as it did, we find it impossible to say that the very length of the deliberations in itself resulted in a fatally coercive or suggestive influence upon the jurors. Any argument which the defendant makes, then, must rely on other factors, such as the trial court's remarks to the jury. A review of those remarks on the three important occasions on which the court addressed the jury, however, reveals no hint of improper influence or suggestion.

The first communication between the judge and the jury after the jury's deliberations had begun came when, at about 9:45 p.m. on January 13, 1975, the court called the jury into the courtroom. The following dialogue between the judge and the jury foreman then ensued:

"The Court: I just want to ask you some questions. Merely answer them yes or no. You don't have to expand your answer. Yes, or no.

Do you feel that you will be able to reach a verdict within the next hour? Just answer yes or no.

The Foreman: I would say yes.

The Court: Okay, I don't want to rush you. I don't want to pinpoint you to any particular time or anything else. I just want to know basically if you feel that within the next hour you feel that you may reach a verdict, is that correct?

The Foreman: Yes.

The Court: Okay, thank you. You may go back to the jury room and continue your deliberations."

We find in the court's remarks here no suggestion whatsoever that failure to reach a verdict would mean unreasonably extended deliberations. Nor does the defendant argue the presence of such impropriety. On the contrary, we find that in its first such contact with the jury the court quite effectively set a tone of respectful consideration for the free will and autonomy of the jurors.

On the second occasion, in informing the jurors of his decision to lodge them in the jury quarters for the evening, the judge said:

"I received your note which reads, 'We cannot reach a verdict. What is the alternative?'

The alternative is going to be that I am going to, at this time lock you up for the evening so you can get a fresh start in the morning. So you can sleep on it and I feel that if you sleep upon it and you think about it in the morning, I hope that we will be able to reach a verdict.

So the cars are all in the back?"

The Bailiff: "Yes, Judge."

"So what we are going to do is lock you up for the evening. You will be provided with quarters which are right adjacent to here. You can walk over to the quarters. You will sleep for the night, you will have breakfast in the morning, you will come back here and continue with your deliberations.

The deputies will allow you to make any necessary phone calls at home to tell them what is happening to you and so I will see you in the morning. I hope all of you have a nice sleep. I assure you the quarters are good and the accommodations will be good.

The deputies will stay with you. You may go."

In this we see nothing which could realistically be characterized as in any way coercive or suggestive. The court merely informed the jurors with due kindness and concern that they would be spending that night in the quarters, and that it was his hope that they might reach a verdict thereafter.

■■■ As to the supplemental instruction which the court read to the jury after about two more hours of deliberation, we find that the instruction in itself cannot be said to be suggestive or coercive. The court correctly read the instruction to the jury directly from *People v. Prim.* The instruction contained the express admonition that jurors should not surrender their honest convictions merely because of the opinions of others or for the purpose of reaching a verdict. Further, we find that the instruction was given under the circumstances contemplated in *Prim.*

Clearly, the charge cannot be said to have been coercive in that it was given prematurely (cf. *People v. Jackson* (1975), 26 Ill. App. 3d 618, 325 N.E.2d 450; see also *People v. Wilson* (1976), 37 Ill. App. 3d 560, 346 N.E.2d 161); also, as established above, it was given at a time when it was still within the court's discretion to permit further deliberations. The very fact that the jury deliberated for about 1½ hours after receiving the *Prim* charge is indicative of the nondisruptive effect of the charge. See *People v. Drayton* (1972), 7 Ill. App. 3d 812, 288 N.E.2d 922; cf. *People v. Richards* (1968), 95 Ill. App. 2d 430, 237 N.E.2d 848.

Finally, we think that the words with which the court, after reading the *Prim* charge, sent the jury back to its deliberations are so important as to bear repetition. At the conclusion of the charge, the court said:

> "So, with that in mind, I want you to go back and I will see in a while longer if you are any closer to a verdict.
>
> You may go back and continue your deliberations at this time."

We think it fairly clear that in this last crucial remark to the jury the trial judge, rather than directly or implicitly threatening to require continued deliberations until a verdict was reached, gave the jurors reason to believe that he was simply asking for one last attempt at a verdict.

■■ Nevertheless, the defendant maintains that the jury's verdict may have been the product of improper coercion or suggestion. In view of the above, we find this argument to amount simply to the contention that because the jury expressly asked what its "alternative" was, given its feeling of inability to reach a verdict, the trial court committed reversible error in not fully answering that question. We cannot accept such a view. First, we find no authority which indicates that in Illinois the trial judge has a specific duty to answer questions put by the jury. Secondly, we do not attach any special significance to the jury's direct inquiry regarding its "alternative." Such an inquiry is implicit in, as the major purpose of, any spontaneous communication by the jury of an inability to reach a verdict. Recognition of this fact is clearly reflected in the language of *People v. Prim*:

> "While acknowledging the possible coercive dangers inherent in a supplemental instruction given to a deadlocked jury, we do not feel that a jury should be left to grope in such circumstances without some guidance from the court. Jurors, and especially those voting in the minority, conceivably could feel a coercive influence if *when seeking guidance from the court* they are met with stony silence and sent back to the jury room for further deliberation. See Comment, Deadlocked Juries and Dynamite: A Critical Look at the 'Allen Charge,' 31 U. Chi. L. Rev. 386, 393." (Emphasis added.) 53 Ill. 2d 62, 74, 289 N.E.2d 601, 608.

■■ In this respect, then, the present case presents no unusual

circumstance. To hold here that there was fatal error in the court's failure to instruct the jury of the possibility of discharge without a verdict would be to say for practical purposes that in every case where the court properly charges the jury as provided in *Prim* it must also advise of the possibility of discharge or be guilty, in the language of section 5.4(b) of the ABA Standards, of "threatening" to require unreasonable deliberations. This cannot be the case, for certainly, if the Illinois Supreme Court had envisioned such a requirement it would have included some direct reference to discharge without a verdict in the model instruction set forth in *Prim*. Further, while the court in *Prim* stated that Illinois courts are to comply with section 5.4 of the ABA Standards, a reading of that section makes obvious the fact that those who drafted the ABA Standards did not intend that section 5.4(b) and (c) should actually be included in any instruction to the jury. These provisions were simply included as directions to the court for its own guidance.

The defendant seeks to rely on *Jenkins v. United States* (1975), 380 U.S. 445, 13 L. Ed. 2d 957, 85 S. Ct. 1059. However, *Jenkins*, and other cases in which fatal error was found in the trial court's effectively threatening to require unreasonable deliberations, can be readily distinguished from the present case. In *Jenkins*, the defendant's conviction was overturned because the trial court, in addressing the jury, had said, "You have got to reach a verdict in this case." Similarly, in *United States ex rel. Tobe v. Bensinger* (7th Cir. 1974), 492 F.2d 232, error was found in the court bailiff's statements to the jurors that they had to deliberate until a verdict was reached. We would not hold that in order to constitute reversible error any such improper influence on the jury must come in such clear and unequivocal terms. However, nothing in the words or other conduct of the trial judge in this case can be fairly characterized as even indirectly implying the kind of ultimatum presented to the jurors in *Jenkins* and *Tobe*. Consequently, the potential for coercive effect upon the jury here cannot be said to approach that present in those cases.

The defendant, in our opinion, in asking us to require trial judges expressly to advise the jury of the prospect of discharge without a verdict offers a cure much worse than the speculative ill of which he complains. To do as the defendant asks would be to disrupt the delicate balance of neutrality in instructing deadlocked juries which the court in *Prim* sought to achieve. Ultimately, it is for the trial court rather than the jury to decide whether discharge is appropriate; the jury is sufficiently burdened with the question of guilt. To inform the jury that its inability to reach a verdict might be grounds for a mistrial would not aid it in its given task, but rather would tend only to complicate the deliberations, making that task even more difficult.

Accordingly, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.