THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD RASHID, Defendant-Appellant.

First District (5th Division)    No. 79-217

Opinion filed March 28, 1980.

James J. Doherty, Public Defender, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and conspiracy to commit murder. He was sentenced to a prison term of 50 to 150 years. On appeal defendant contends that: (1) the prosecutor's inquiry of a witness as to the commission of other crimes by defendant was so prejudicial that it deprived him of a fair trial; (2) the trial court erred by giving a deadlock instruction to the jury; and (3) the conspiracy conviction is erroneous. We affirm in part and reverse in part. The following facts were adduced at trial.

In February of 1974, Paul Bivens, the victim, and Georgia Lee Bivens were living apart as a result of marital problems. Paul Bivens was living in the office of his plumbing and sewer business on Lawndale Avenue. On February 2, 1974, Mrs. Bivens and her two sons, Richard and Clark Puckett (children of a prior marriage), went to the apartment of Richard T. Covelli at 3210½ Sunnyside Avenue, where he lived with Linda Dworak and her two children. Mrs. Bivens had been drinking that day and while at the apartment remarked that she would pay someone to kill her husband, Paul. Covelli responded, "I'm your man." Following further discussion, Mrs. Bivens and Covelli agreed upon a price of $300 plus "a $200 bonus if the job was done right."

Later that afternoon, defendant Richard Rashid, also known as "Rabbi," arrived at the apartment, whereupon Covelli announced that they were partners. Defendant stated that he would need $50 in advance for the purchase of a gun. Mrs. Bivens gave him $50 and stated that would

"come off the top of the $500." She and her sons then went to her apartment to obtain a photograph of the victim. Thereafter, they proceeded to the "F and Z" tavern where they met Covelli, Linda Dworak, and defendant.

While at the tavern, Richard Puckett gave the photograph to Covelli, who remarked, "I will have to live with this face for a long time." Covelli gave the photograph to defendant, who also examined it. Richard then gave Covelli a key to the victim's office and upon Covelli's request, he drew a diagram of the interior of the office. After examining the diagram, Covelli gave it to defendant who stated, "He can thank God he has got another 24 hours to live." Covelli then remarked that they would make the office appear as though it had been burglarized and then kill Paul Bivens.

On the afternoon of February 25, the same group of people met at Covelli's apartment. During that meeting Covelli sawed off the barrel of his .410 gauge shotgun and defendant, who was accompanied by his girlfriend Shiela Howard, cleaned a .44-caliber handgun and bullets he brought with him. As he cleaned the gun and bullets he stated that it would get the job done.

Shortly thereafter, Covelli and defendant left the apartment with their guns. The others left and went to the Bug Eye Tavern, arriving at about 8:30 or 9 p.m. While at the tavern, Mrs. Bivens received a telephone call after which she stated that Covelli and defendant were waiting in the victim's office. After receiving a second phone call she stated that it was defendant and that the job was done. After receiving a third phone call, she shouted, "Oh, my God, Paul's been shot." She then gave Richard $450 and proceeded to the hospital with her son Clark.

When Covelli later arrived at the tavern, Richard gave him $450 and they all went to Covelli's apartment. While en route, Covelli and defendant described the shooting of the victim. Covelli stated that he shot the victim as he entered the office; he spun in the doorway and fell onto the sidewalk. Covelli then ran out past him and into an alley. Defendant stated that he walked from behind the counter where he was standing and went outside where the victim lay, straddled him and shot him several times. Each time the victim was shot, "he squealed like a stuck pig and bounced." Defendant then told Richard to destroy the guns which he had thrown on top of a garage around the corner from the victim's office. On the following day, February 26, Richard and Clark retrieved the guns and put them in a suitcase in the basement of Mrs. Bivens' apartment.

On February 25 at approximately midnight, Mrs. Ethel Stermer was in the kitchen of her apartment which was directly opposite the victim's office. Upon hearing a "terrific noise," she looked out of the window and observed the door to the victim's office partially opened with a light on

inside. A man was standing in front of the door firing a gun towards the sidewalk. However, she could not see his face nor could she see the sidewalk due to the parked cars. As she telephoned the police, she observed the man as he ran down the street and into an alley.

Within minutes Officer Dorner and his partner responded to the radio call and upon arriving at the scene found the victim lying on the sidewalk. The door to the office was opened; however, there were no signs of forced entry. The office appeared to have been ransacked. Approximately two feet inside the office a .22-caliber pistol was found lying on the floor. Eleven .410-gauge shotgun shells and twenty-four .22-caliber bullets were also recovered from the pockets of a suede jacket. Prior to being transported to the hospital, the victim told Dorner that he had been shot by two fellows who ran down the alley. On or about February 28, the victim died.

In the early morning hours of March 2, Edward Puckett, the father of Richard and Clark Puckett, arrived in Chicago to attend the funeral services of the victim. He proceeded to the victim's office where he met Richard, who gave him a .44-caliber handgun and described a crime. The gun was subsequently turned over to the police as was the .410-gauge shotgun hidden in the basement of Mrs. Bivens' apartment.

Thereafter, Mrs. Bivens and Covelli were arrested by Investigator James Griffin. On March 4, Griffin, Clark Puckett, Rickey Landrum, and other investigators went to a building at 1259 Sunnyside in an attempt to arrest defendant. Landrum entered the building to find defendant and when he came out, he was bleeding from the mouth and some of his teeth had been knocked out.

On February 26, 1975, defendant was arrested by an FBI agent at the Admiral Oasis Hotel in Morton Grove. At that time, defendant emerged from a room registered to Abed Bader. He also carried a driver's license and social security card bearing that name.

Based upon an autopsy of the victim's body performed by the Cook County Medical Examiner, it was determined that the cause of death was a bullet wound to the pelvic bone and penetration of the intestine. Five bullets had entered the victim's body, none of which appeared to have been inflicted by a shotgun.

During the redirect examination of Richard Puckett regarding Rickey Landrum's involvement in the apprehension of defendant, the following colloquy occurred:

"Prosecutor: By the way, this individual, Rickey Landrum, did he try to help the police in trying to locate this individual Rabbi, to your knowledge?

Defense Attorney: Objection.

The Court: Sustained.

Prosecutor: Q. By the way, Is Rickey Landrum today alive or is he dead?

Defense Attorney: Objection.

The Court: If he knows, he may answer.

Defense Attorney: Judge, objection.

The Court: May answer.

Witness: He is dead.

Prosecutor: Q. Did that occur after he tried, Rickey Landrum tried to help the police in ascertaining the whereabouts of this gentleman right here, Mr. Rabbi?

Defense Attorney: Objection. I have a motion.

The Court: Sustained.

Defense Attorney: I have a motion, Judge, for mistrial. I have never, ever seen anything like that in my life.

The Court: I will accept your motion later. Jury should disregard that."

During the examination of Investigator Griffin regarding his efforts to arrest defendant, the prosecutor made the following inquiry:

"Q. Did you have an occasion to do anything else with respect to locating Mr. Rashid?

A. We pulled a burglary report from October, 1973.

Defense Attorney: Objection, Your Honor.

The Court: Sustained.

Defense Attorney: I would ask that it be stricken.

The Court: The jury is to disregard."

After approximately 2½ hours of deliberation, the jury sent the following note to the trial judge: "What if you find him guilty on one charge and not on the other?" The court then responded by note as follows: "You have a right to give separate consideration to the guilt or innocence of the defendant on each charge." Neither the prosecutor nor defense counsel objected. Approximately two hours later, the jury sent another note to the judge which stated: "We have made a decision on one of the charges but cannot come to a unanimous decision on the other charge. * * * It's hopeless."

Based on the communications from the jury, the court informed all counsel that the *Prim* charge would be given to the jury. Over defense counsel's objection that the instruction was premature, the following colloquy ensued:

"The Court: All right. Be seated, please. Who is the foreman?

Jury Foreman: (Raises hand.)

The Court: Sir, I received a note from you telling me you have come to a decision on one of the charges but cannot come to a decision on the other charge.

Now, I don't want to know what finding you have made, but I just want to ask you if I gave you further time, do you think you could come to a decision on the other charge?

Jury Foreman: The way it stands—

The Court: Is your answer yes or no?

Jury Foreman: No.

The Court: Okay. Under those circumstances then, I would like to read you this further instruction, and then I will give you some more time to deliberate.

Now, the verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself and do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans, you are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in this case."

The judge then gave the jury a copy of this instruction and said, "You may deliberate further." After an interval of time the judge remarked as follows:

"All right. I have got another note from the jury saying, 'We have re-deliberated and have still come to the same conclusion.' Whatever that is. I think it being 8:35 now, and everybody is kind of tired. I think I will send them out for, sequester them for the evening."

The following morning the jury rendered guilty verdicts as to both murder and conspiracy to commit murder. Defendant was thereafter sentenced to a prison term of 50 to 150 years. Defendant now appeals from those convictions.

## Opinion

Defendant initially contends that the prosecutor's inquiry of two witnesses as to the commission of other crimes by defendant was so prejudicial that it deprived him of a fair trial. He argues that such inquiry resulted in his implication in the death of Rickey Landrum and his involvement in a burglary, which evidence so inflamed the jury that it

precluded any fair consideration of the present charge for which he is on trial. We disagree.

Generally, evidence of the commission of other crimes by the accused is not admissible to show propensity to commit a crime. There are, however, several recognized exceptions. Where the challenged evidence goes to show motive, intent, identity, absence of mistake, *modus operandi*, or the evidence is relevant to the issue of guilt of the offense on trial, it is admissible though it may incidentally show the commission of a separate offense. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608.

■ During redirect examination of Richard Puckett, the prosecution inquired into the death of Rickey Landrum, who assisted the police in their attempt to locate defendant. Upon an examination of the specific inquiry in question, we cannot say that it amounted to evidence of defendant's involvement in other crimes. On the contrary, the only evidence elicited during the exchange was that Landrum was dead. We hold, therefore, that such inquiry was not prejudicial and did not deprive defendant of a fair trial.

■ The second instance of improper prosecutorial inquiry cited by defendant occurred during the examination of Investigator James Griffin regarding his efforts to apprehend defendant. Defendant argues that the answer given by Griffin implied that defendant was involved in a burglary. While we agree that the evidence may have raised such an inference in the minds of the jurors, we find that defendant was not prejudiced thereby. There was ample evidence presented at trial to support the jury's verdict absent the evidence complained of by defendant. Moreover, after each exchange cited by defendant, defense counsel offered timely objections which were immediately sustained. Consequently, even if the comments were improper, their effect was harmless in light of the court's prompt action. (*People v. Negron* (1979), 77 Ill. App. 3d 198, 395 N.E.2d 1055.) As stated by the court in *People v. Harris* (1979), 70 Ill. App. 3d 363, 369, 387 N.E.2d 1109, 1113, quoting from *People v. Olivier* (1972), 3 Ill. App. 3d 872, 878, 279 N.E.2d 363, 367, "[i]t is not the policy of this court to reverse a judgment merely because error has been committed unless it appears that real justice has been denied or that the finding of guilty may have resulted from such error." We find, therefore, that defendant's conviction does not warrant reversal on this basis.

Defendant next contends that he was denied a fair trial in that a deadlock instruction was given prematurely by the trial court. We cannot agree.

In *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied*

(1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, the Illinois Supreme Court set forth the standards to be followed by the trial courts when faced with deadlocked juries. There, the court held that the instruction under review was not prejudicially coercive in that it did not interfere with the deliberations of the jurors nor did it hasten their verdict.

■■ Here, the instruction contained language virtually identical to that given in *Prim.* Furthermore, it was given under the circumstances contemplated in *Prim, i.e.,* after the judge was apprised of the deadlocked status of the jury. Therefore, the instruction cannot be said to have been coercive in that it was given prematurely. *People v. Allen* (1977), 47 Ill. App. 3d 900, 365 N.E.2d 460.

As to defendant's argument that the sequestration of the jury added physical inducement to psychological coercion, we find it to be totally without merit and unsupported by the record. Accordingly, we find that defendant was not denied a fair trial by the giving of the instruction.

Lastly, defendant contends, and the State now concedes that the conviction for conspiracy to murder must be reversed. Section 8—5 of the Criminal Code provides that "[n]o person shall be convicted of both the inchoate and the principal offense." (Ill. Rev. Stat. 1977, ch. 38, par. 8—5; *People v. Love* (1978), 60 Ill. App. 3d 16, 376 N.E.2d 342.) Accordingly, the conviction for conspiracy is reversed. We note, however, that our reversal of this conviction has no bearing on the 50-to-150-year sentence imposed by the trial court. In light of the seriousness of the offense of murder, especially that of murder for hire, we do not regard the sentence as excessive under the circumstances.

For the reasons stated, the judgment of the trial court is affirmed in part and reversed and vacated in part.

Judgment affirmed in part and reversed and vacated in part.

LORENZ and MEJDA, JJ., concur.