THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANDREA J. DUNGY, Defendant-Appellant.

First District (2nd Division)    No. 82—1139

Opinion filed January 31, 1984.—Rehearing denied March 27, 1984; April 3, 1984.

Aldus S. Mitchell and Stephen Stern, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Maria Elena Gonzalez, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Andrea J. Dungy (defendant) appeals from her September 30, 1981, conviction by a Cook County circuit court jury of retail theft (Ill. Rev. Stat. 1979, ch. 38, par. 16A–3(a)) and the trial court's April 1, 1982, order denying her post-trial motions. Defendant was sentenced to six months' conditional, nonreporting discharge.

On appeal, defendant contends that the trial court erred in: (1) violating her fifth and fourteenth amendment rights by denying her pretrial motions thereby allegedly allowing her to be twice subjected to prosecution for the same crime; (2) permitting the jury to separate during deliberations; (3) giving the *"Prim* Charge" jury instruction; and (4) denying her post-trial motions.

On October 21, 1977, defendant was arrested at Marshall Field's (Field's) State Street store in Chicago after being detained on suspicion of "shoplifting" by a store security guard, Thomas Seablom (Seablom). Seablom signed a complaint charging defendant with the theft of a purse. Defendant was accused of the theft of a purse valued less than $150. On November 14, 1977, this complaint was filed in Cook County circuit court. On June 7, 1979, because the original complaint apparently had been misplaced and was unavailable, the State was granted leave by the trial court to file a "substitute" complaint. On November 28, 1979, prior to the beginning of trial, the State was, over defendant's objection, granted leave of court to amend the June 7, 1979, complaint changing the description of Field's from "an Illinois corporation licensed to do business in the State of Illinois" to "a retail mercantile establishment" as prescribed by the retail theft statute (Ill. Rev. Stat. 1979, ch. 38, par. 16A–3(a)). On November 28, 1979, defendant's first trial ended in a mistrial due to her hospitalization. On January 21, 1980, following her second trial, defendant was found guilty of retail theft. On May 5, 1980, the trial court granted defendant's motion for a new trial based on the possibility that "manufactured" evidence was used at trial.[1] On January 14, 1981, defendant's third trial ended with a hung jury and, upon defendant's motion, a mistrial was declared.

---

[1] It appears that photographs of the display area described by officer Seablom as having been taken by him on a given day were in fact on film not manufactured, according to the film company, until a subsequent date.

On September 21, 1981, prior to the start of defendant's fourth trial, she filed a motion to dismiss the charges against her. She contended that reprosecution would violate her rights to be free from "double jeopardy." Defendant also argued that the original complaint of October 21, 1979, was "insufficient as a matter of law to sustain the charge of retail theft" and that the second complaint was improperly filed. On September 22, 1981, defendant's motion was denied and defendant's fourth trial began.

Thomas Seablom, a Field's store security guard, testified to the following:

On October 21, 1977, Seablom was on duty in the fifth floor Wabash area of Field's Chicago State Street store when he observed defendant remove a purse from around the neck of a display mannequin, "take the price tag off the purse and drop it on the floor and insert the purse into a plastic bag." Defendant then approached the "adjustment desk" and "requested a refund." She was "unable" to obtain a refund and carrying her own purse and the plastic bag containing the display purse, she walked from the adjustment desk to a "down" escalator. Seablom got on the escalator behind defendant, identified himself as a Field's security guard and asked her to accompany him to the second floor security office. Defendant did so. Defendant was taken to a small interrogation room and the plastic bag she was carrying was taken from her by Seablom. Seablom returned to the fifth floor and retrieved the price tag that defendant allegedly dropped on the floor. When he returned to the interrogation room, he searched the contents of defendant's purse. In so doing he noted and recognized the name of defendant's brother, Dennis Dungy, as that of an individual he had detained for shoplifting one year earlier. Seablom "assumed" that defendant and Dennis Dungy were related.

During cross-examination Seablom acknowledged that during a previous trial in this matter he testified that defendant told him that she was attempting to exchange the purse because of a defect.

Three other Field's security guards, including two supervisors Charles Brown and Timothy J. Bogert, testified to the procedures utilized by Field's when securing materials to be used as possible evidence in future prosecutions.

Samuel Toia, a Field's employee, next testified to the following:

On October 21, 1977, while working in the fifth floor shoe department, he saw defendant "walk up to a display and take a handbag off a display." Defendant placed the handbag in "a bag" and then walked around a coat display to the adjustment desk where

defendant requested a refund. He contacted a floor manager, Susan Lawler, and told her what he had seen. He then "returned to [his] business."

During cross-examination Samuel Toia acknowledged that only two days before her arrest he had unsuccessfully attempted to sell defendant a coat. Toia stated that although defendant "was dissatisfied [he] didn't have her size," he could not say that she had insulted him.

The State rested and defendant's motion for a directed verdict was denied.

Dennis Dungy testified on his sister's behalf to the following:

In 1976 he was detained by Thomas Seablom on suspicion of "shoplifting." He was arrested on that charge after Seablom signed a complaint. The State's objection to Dennis Dungy's further testimony regarding that incident was sustained. Defense counsel, however, was permitted to make a "question-and-answer" offer of proof for the purpose of establishing Seablom's alleged bias toward defendant and her family. Following the offer of proof, the court concluded that the testimony added nothing to the testimony previously elicited during the State's case in chief and, as such, would not be presented to the jury.[2] The court explained that "the testimony of [Dennis Dungy] does not indicate that the party who arrested him had any knowledge of who his sister was at the time the incident [October 21, 1977] occurred."

Other defense witnesses included defendant's mother, Mildred Dungy, who stated that defendant was "given the privilege to use" her Field's charge card. Loretta Kinach-Boffa, a Field's employee, testified that a sales receipt offered in evidence by defendant reflected that on October 18, 1977, three days before defendant's arrest, Boffa had in fact sold an "Aigner" purse model number 4115 priced at $62. Jim Jensen, another Field's employee, testified that the price tag allegedly retrieved by Seablom after observing defendant tear it from the display purse and drop it on the floor, contained a "style number" different than that of the purse defendant was accused of stealing. However, when asked if he ever found a wrong price tag attached to a particular "Aigner product," Jensen responded: "Occasionally, very rarely, it does happen."

---

[2]Dennis Dungy's testimony reiterated the same facts elicited during the testimony of officer Seablom including the fact that Dennis was found not guilty by a jury of the charge of retail theft and brought a civil action against Marshall Field's and officer Seablom. This suit was pending at the time of defendant's arrest and was settled out of court in the spring of 1978.

Defendant testified to the following:[3]

On October 21, 1977, she arrived in Chicago from Valparaiso, Indiana, where she was enrolled as a third-year law student at Valparaiso University. Among the items defendant carried with her to Chicago was a "Carson, Pirie Scott draw string bag" containing a purse she purchased on October 18, 1977, at Field's State Street store. Defendant "intended to return" this purse because it "had a defect on it." Defendant arrived at Field's about 4:30 p.m. She purchased a pair of shoes and then proceeded to the fifth floor Wabash side of the store and to the department where on October 18, 1977, she had purchased the first purse. Upon her arrival in that department, she noticed a purse which was "similar to the one [she] wanted." She placed her packages on the floor next to the exchange desk, "reached up on the display shelf and took the bag off that was similar to the one [she] wished to exchange, and [she] set it on top of the exchange desk." Defendant spoke with a Field's employee, "Mr. Kidd," at the exchange desk.[4] She asked if the man who had "overseen" the purchase of the purse on October 18, 1977, Mark Warning, was working. Mr. Kidd told defendant that Mark Warning was not working and any exchange she wished to make would have to be an "even exchange." Kidd took the "Carson's" bag from defendant, placed it on the exchange desk and told another Field's employee that "it was an even exchange." Officer Seablom then approached Mr. Kidd and asked "what the problem was." Mr. Kidd responded that there was no problem. Defendant attempted to explain to Seablom that, although she left her receipt at home, "the bag was an even exchange." Seablom told her "he wasn't talking to her," grabbed her by the arm and told her she had to come with him. At that time defendant's packages were still on the floor near the exchange desk and the purse she wished to exchange, along with the purse she had removed from the display shelf, was still on the exchange desk. She managed to take her packages, including the bag containing the purse she wished to exchange, with her as she accompanied Seablom. In the security office defendant was asked to sign an admission of guilt form and a release of liability of Field's arising from a "false arrest." Defendant

---

[3]At the outset of defendant's testimony on September 22, 1981, she stated that she was, and had been since June 1981, a patient and resident of Ridgeway Psychiatric Hospital. Defendant's emotional illness and hospitalization was the cause of the first mistrial in this matter. There has been no speculation by either party what, if any, effect this information had on the jury.

[4]Mr. Kidd did not testify nor were other employees of Field's to whom defendant allegedly spoke on October 21, 1977, called to testify.

refused to sign the forms and again explained that she had a receipt for the purse. She requested that the security guards "check the records" to establish that she had in fact purchased the purse. The security guard supervisor, Charles Brown, told her she would go to jail if she did not sign the documents. She refused and the Chicago police were called. She was placed under arrest and the complaint was filed.

Defendant then testified that the purse admitted at trial as People's exhibit No. 1, which Seablom identified as the purse defendant removed from the display, was not the same purse that she brought to the Field's State Street store in the plastic "Carson's" bag.

Following defendant's testimony, the defense rested.

The jury was instructed by the trial court and began deliberations. At approximately 7:30 p.m., after more than five hours of deliberation, the jury sent to the trial judge a note asking: "Is it possible to have a hung jury?" Before the jury returned to the courtroom, the court, in chambers, discussed with counsel the possibility of allowing the jury to adjourn to their homes for the night. Both defense counsel and prosecutor partook in this discussion without objection. Defense counsel suggested additional admonishments for the jury which the court in fact gave. The jury returned to the courtroom and was informed that it would be "discharged" for the evening with deliberations to resume the following morning. The court, without answering the jury's question regarding the possibility of a hung jury, admonished the jury and allowed them to return to their homes. The following morning the trial court answered the jury's question and told them that it was indeed possible to have a hung jury.

The jury reconvened their deliberations at 9 a.m. and continued for nearly eight hours until about 4:45 p.m. At that time the jury again sent a note to the court which read: "The jury is firm on their votes, no compromises, no total agreement, hung jury."

The court informed counsel of his intent to deliver the so-called *"Prim* Instruction" to the jury. Following a brief argument and objection by defense counsel, the court delivered, orally, the following instruction:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of

your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous; but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

At 4:50 p.m. the jury resumed its deliberations. At 5:30 p.m. the jury returned a verdict of guilty. Although the motion by defense counsel requesting that he be allowed personally to poll the jurors individually was denied, the jury was in fact polled by the court asking each juror if this was his or her own verdict. Each answered "yes."

On October 29, 1981, defendant filed a post-trial motion which was subsequently amended. Among the specific allegations assigned as error was the contention (accompanied by affidavits of two jurors) that the jurors reached their verdict in part because of the failure of any Field's employees working at the exchange desk on October 21, 1977, to testify. Defendant argued that this fact indicates that the jurors ignored the court's instructions and improperly placed the burden upon defendant to prove her innocence.

On April 1, 1982, defendant's post-trial motions were denied and she was sentenced to six months' conditional, nonreporting discharge. Defendant appeals from her conviction and from the denial of her post-trial motions.

Initially, defendant contends that the trial court erred in allowing her to be twice prosecuted for the same crime.

On May 5, 1980, following defendant's second trial and conviction, the court granted her motion for a new trial. The court stated that defendant's motion was sustained "on the basis of the material deviation" between the testimony of officer Seablom and information contained in affidavits supplied to the court by defendant which alleged that certain photographic evidence offered at trial may have been "manufactured" by officer Seablom. The court stated that this material deviation

"might have effected [*sic*] this jury, might have effected [*sic*] the decision of the jury. And based on that ground alone I'm granting a motion for a new trial."

Prior to defendant's third and fourth trials, defendant moved for dismissal of the charge against her contending, as she does on appeal, that the "effect of the court's [May 5, 1980] ruling was a determination that the court did not believe the evidence of the occurrence offered by the prosecutor to be sufficient to sustain the conviction." As

such, defendant argued that the trial court should have granted her motion for acquittal.

■ It is well established that an individual may not be twice prosecuted for the same offense. (Ill. Rev. Stat. 1979, ch. 38, par. 3—4(a); *Burks v. United States* (1978), 437 U.S. 1, 11, 57 L. Ed. 2d 1, 9, 98 S. Ct. 2141, 2147.) A subsequent prosecution is not, however, barred if the conviction is set aside "due to trial error" rather than "evidentiary insufficiency." 437 U.S. 1, 15, 57 L. Ed. 2d 1, 12, 98 S. Ct. 2141, 2149.

■ We do not believe that the trial court's May 5, 1980, order granting defendant a new trial was based upon its determination that the evidence was insufficient. Rather, we conclude that the court in this instance determined that defendant was convicted "through a judicial process which [was] defective in some fundamental respect, *e.g.*, incorrect receipt or rejection of evidence." (437 U.S. 1, 15, 57 L. Ed. 2d 1, 12, 98 S. Ct. 2141, 2149.) Defendant was not in our opinion subjected twice to prosecution for the same crime.

■ Next, defendant contends that the trial court in allowing the jury to separate and adjourn to their homes during deliberations committed reversible error. Section 115—4(l) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 115—4(l)) provides:

"When the jury retires to consider its verdict an officer of the court shall be appointed to keep them together and to prevent conversation between the jurors and others. Upon agreement between the State and defendant or his counsel the jury may seal and deliver its verdict to the clerk of the court, separate, and then return such verdict in open court at its next session."

Defendant urges this court to follow the decision in *People v. Ritzert* (1974), 17 Ill. App. 3d 791, 308 N.E.2d 636, in which Ritzert was convicted of driving while intoxicated. After the jury had deliberated for over four hours and prior to their reaching a verdict, the trial court, in *Ritzert*, asked counsel whether a mistrial should be declared or if the jury should be allowed to go home for the night and resume deliberations the following morning. Defendant preferred that a mistrial be declared, and the prosecutor urged that the jury be sent home. (17 Ill. App. 3d 791, 791-92.) The trial court sent the jury home. The following morning the defendant objected to the procedure, but the trial court noted that no objection had been voiced prior to the jury's release. The Second District of this court reversed defendant's conviction and found that defendant's failure to object to the separation was of no consequence and that under the statute, agreement to such a separation is permitted "only after the jury has

concluded deliberations and sealed their verdict." 17 Ill. App. 3d 791, 795.

More recent decisions of this court have interpreted section 115—4(l) more liberally. In *People v. Jackson* (1982), 105 Ill. App. 3d 750, 758, 433 N.E.2d 1385, the court determined that, where defendant, through his attorney, agreed to allow the jury to go home for the evening and made no objection to the procedure the following morning, defendant had knowingly and intelligently waived the statutory requirement of section 115—4(l).

In the instant case, prior to the beginning of defendant's fourth trial, the court indicated to counsel that if circumstances warranted, it would allow the jury to separate and retire to their homes during deliberations. Defense counsel made no objection at that time. When, in fact, the jury was deadlocked after deliberating for more than five hours, the court indicated its intent to allow the jury, after proper admonishment, to retire to their homes and to return the following morning. Not only did defense counsel fail to object to the court's proposed action, but he participated in the procedure by suggesting additional cautions for the jury. No objection by defendant to the procedure was made on the following morning. The defendant offers no evidence to establish that she was in any way prejudiced by this procedure. See *People v. Payton* (1980), 84 Ill. App. 3d 181, 184, 405 N.E.2d 18.

Under these circumstances, it appears to us that defendant, through her counsel's active participation in the procedure utilized by the court, waived objection to such procedure.

■ Defendant next asserts that the trial court erred in orally giving the so-called *"Prim* Instruction."

The Illinois Supreme Court in *People v. Prim* (1972), 53 Ill. 2d 62, 75-76, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, directed. courts of this State, when faced with deadlocked juries to instruct the jury as the trial court did in the instant case.

In *Prim*, after four hours of deliberation, the jury was brought into the courtroom and asked if they were hopelessly deadlocked. The foreman indicated that he thought there was a chance to reach a verdict. (53 Ill. 2d 62, 71.) The trial court then reminded the jury of its duty, in terms similar to that set out above, and the jury returned to deliberate. Fifteen minutes thereafter a verdict of guilty as charged was reached. (53 Ill. 2d 62, 72.) The court in *Prim* acknowledged the "coercive dangers" inherent in such an instruction given to a deadlocked jury. The court concluded, however, that such action was pref-

erable to allowing the jury "to grope in such circumstances without some guidance from the court." 53 Ill. 2d 62, 74.

It has been held that when assessing the coercive nature of an instruction given as directed in *Prim*, consideration should be accorded to the time when the instruction is given and to the length of time the jury deliberates after such instruction. (*People v. Bonds* (1980), 87 Ill. App. 3d 805, 813, 410 N.E.2d 228; *People v. Allen* (1977), 47 Ill. App. 3d 900, 907, 365 N.E.2d 460.) It is within the trial court's discretion to permit further deliberation and to monitor the length of such deliberation even after a jury has indicated that it is "hopelessly deadlocked." *People v. Allen* (1977), 47 Ill. App. 3d 900, 906.

The jury in this case deliberated for more than five hours and prior to reaching a verdict, retired for the night. The following day, after deliberating for an additional seven hours, the jury sent a note to the court which read: "The jury is firm on their votes, no compromises, no total agreement, hung jury." The court indicated that whether there was in fact a "hung jury" was a determination to be made by the court itself and not the jury. The court then, over defense objection, gave the *"Prim* Instruction" to the jury. The jury continued deliberations for about 40 minutes and returned a verdict of guilty.

■ Our review of this record, being mindful of the protracted nature of this case, leads us to conclude that the trial court did not abuse its discretion when it gave to the jury the *"Prim* Instruction."

■ Finally, defendant contends the trial court erred in denying her post-trial motion which *inter alia* challenged the sufficiency of the original complaint.

It is well established in Illinois that where, as here, the sufficiency of a charge is challenged in a motion in arrest of judgment, the standard for determining whether the charging instrument is deficient is whether the elements of the offense charged are set forth as required by section 111—3(a) of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1979, ch. 38, par. 111—3(a); *People v. Simmons* (1982), 93 Ill. 2d 94, 99, 442 N.E.2d 891, quoting *People v. Lutz* (1978), 73 Ill. 2d 204, 211, 383 N.E.2d 171.) Section 111—3(a) requires that the charging instrument be in writing, stating the name of the offense and the relevant statutory provisions violated; setting forth the nature and elements of the offense and the date and county in which the offense occurred and naming the accused if known or a reasonably certain description. (*People v. Testa* (1983), 114 Ill. App. 3d 695, 698, 449 N.E.2d 164.) Generally, a charging instrument setting forth the offense in the language of the statute " 'is deemed sufficient when

the words of the statute so far particularize the offense that by their use alone an accused is apprised with reasonable certainty of the precise offense with which he or she is charged.' " *People v. Testa* (1983), 114 Ill. App. 3d 695, 698, quoting *People v. Dickerson* (1975), 61 Ill. 2d 580, 582, 338 N.E.2d 184.

■ The original complaint in the instant case was signed and sworn to by the complainant, officer Seablom, on October 21, 1977. This complaint was filed on November 14, 1977. On May 1, 1979, a bill of particulars was filed by defendant. The original complaint, however, was misplaced. On June 7, 1979, the State was allowed by the trial court to present a "substitute" complaint to the court and to defense counsel. The trial court and defense counsel at that time "acknowledged" receipt of the "substitute" complaint.

Defendant asserts that: (1) the People "never requested or were granted leave to withdraw the first complaint and substitute the second complaint"; (2) that the second complaint filed more than one year and six months after the offense was untimely; (3) that the substitute complaint was "substantially" different from the first complaint; and (4) the first complaint was "insufficient as a matter of law to sustain a charge of retail theft."

■ Our review of the record indicates that the People did request and were granted a substitution of complaints because the original was lost. The substitute, filed on June 7, 1979, with the authority of the court and the acknowledgment of defense counsel, was not a new charge or complaint but was intended as a substitute for the lost original. As such, it was not time-barred.

Defendant asserts that the original and substitute complaints are substantially different and that the original complaint was insufficient to charge the offense of retail theft.

Some time after the filing of the June 7, 1979, "substitute" complaint, and before defendant's second trial, the original complaint which had been lost was found and has been made a part of the record on appeal. Comparison of the two complaints reveals that, whereas the original complaint cites the statutory section for "retail theft" and specifies the time and place of the alleged crime and the merchandise involved, it does not, as the substitute complaint does, indicate in the language of section 16A—3(a) that the location of the crime was "a retail mercantile establishment" or that the merchandise was taken "without paying the full retail value ***." Ill. Rev. Stat. 1979, ch. 38, par. 16A—3(a).

We note, however, that during oral argument before this court, defense counsel acknowledged that at all times during these proceed-

ings, including the time during which the original complaint was misplaced, he had in his possession a copy of such complaint. It appears also that defendant was in possession of both the original and the substitute complaints prior to her second trial. It seems clear in our opinion that defendant was at all times apprised with reasonable certainty of the offense with which she was charged.

For the reasons herein stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and DOWNING, JJ., concur.